## In re BESTLINE PRODUCTS SECURITIES and Antitrust Litigation.

### MDL No. 162–Civ–JLK.

United States District Court,
S. D. Florida.

March 19, 1976.

James H. Joseph, Joseph & Hershman, P. C., Pittsburgh, Pa., Carl H. Hoffman, Miami, Fla., for plaintiff class.

J. Russell Pitto, Humphreys, Berger & Pitto, San Jose, Cal., for defendants Best-line Products, Inc., Bestline Corp., Jerry Brassfield, Oliver P. Colvin, James K. Hisler, Norman Miller and Richard Dumont.

Robert B. Hutchinson, Cotchett, Hutchinson & Dyer, San Mateo, Cal., Gerald F. Richman, Frates, Floyd, Pearson, Stewart, Proenza & Richman, Miami, Fla., for defendants William E. Bailey, Towru Ikeda and Martin Day.

Paul, Landy, Beily & Yacos, William M. Hoeveler, Knight, Peters, Hoeveler, Pickle, Niemoeller & Flynn, Miami, Fla., for defendants Richard Grillo, Janin Morgan & Brenner.

Marc W. Watson, Pettigrew & Bailey, Miami, Fla., for defendants Gordon Blaum, Edna Blaum and George Wunch.

## OPINION AND ORDER DETERMINING MOTIONS FOR SUMMARY JUDGMENT

JAMES LAWRENCE KING, District Judge.

### HISTORY OF THE LITIGATION

These proceedings constitute the third in a series of complex cases to be transferred by the Judicial Panel on Multidistrict Litigation to a single forum for coordinated or consolidated pretrial proceedings and which involve Federal securities law claims by alleged classes of private litigants against corporations claimed to have engaged in the offer and sale to the public of distributorships for their products, which distributorships are alleged to be unregistered securities in the nature of investment contracts or certificates of interest in profit-sharing arrangements.[1] Like its predecessors, these proceedings also involve alleged violations of the antifraud provisions of the Securities

---

1. On December 15, 1972, approximately 20 private actions, followed by nearly 100 subsequent tag-along cases, which arose out of the offer and sale by Koscot Interplanetary, Inc. and Dare To Be Great, Inc., subsidiaries of Glenn W. Turner Enterprises, Inc., of multi-level distributorships were transferred pursuant to 28 U.S.C.A. § 1407 to the Western District of Pennsylvania for consolidated or coordinated pretrial proceedings. On April 6, 1973, a dozen private actions followed by several dozen tag-along cases, arising out of the offer and sale of multi-level distributorships by Holiday Magic, Inc. and affiliated corporations were transferred to the Northern District of California for the same purpose. The Transfer Order in these proceedings was entered on April 29, 1974.

Act of 1933 (hereinafter "Securities Act" and the Securities Exchange Act of 1934 (hereinafter "Exchange Act"), as well as violations of various state Blue Sky laws and common law fraud and deceit.

The instant proceedings arise out of the offer and sale by Bestline Products, Inc., a wholly-owned subsidiary of Bestline Corporation (hereinafter collectively referred to as "Bestline"), of pre-purchase Direct Distributorships contracts or agreements (hereinafter referred to as "Direct Distributorships") for the sale and distribution to the consuming public of its line of personal and home care products. Most of the individual actions consolidated in this judicial district assert that the Bestline Direct Distributorships are securities in the nature of investment contracts or certificates of interest in a profit-sharing arrangement, and that they were offered, sold and distributed unlawfully inasmuch as they were neither registered nor accompanied by a prospectus filed in compliance with the rules of the Securities & Exchange Commission.[2] Each such action seeks rescission of the distributorship agreements, as well as damages for fraud in connection with the sale thereof, and reasonable attorneys' fees. Some 40,000 persons are alleged to have purchased or invested in Bestline Direct Distributorships from late 1967 until August 10, 1973, in connection with which such persons paid Bestline an aggregate sum of nearly $120 million. Of those persons, less than 6,000 remain active as Bestline distributors.

A multitude of Defendants are named in the numerous suits, most of whom are present or former officers, directors or controlling shareholders of Bestline, or persons who held the field (as distinguished from Home Office or Headquarters) positions of Assistant Vice President, Regional Director and Area Coordinator.[3] Bestline's officers, directors and controlling shareholders are alleged to have controlled and directed Bestline in its unlawful course of conduct, and together with its field representatives are also charged with aiding and abetting and participating in the alleged unlawful conduct by implementing the actual offer, sale and distribution of Bestline's Direct Distributorships throughout the country. In addition, various lawyers and a law firm which served as Bestline's General Counsel are charged with aiding and abetting the offer, sale and distribution of the Bestline Direct Distributorships, as well as the alleged fraud in connection therewith.

The original suit filed in this judicial district, and the lead suit in the consolidated proceedings, was brought by Florida residents Peter Piambino, Joseph F. Kucklick, Marilyn Koslen, Robert M. Ernst and Michael J. Gardner (hereinafter referred to as the "Piambino Plaintiffs") as a class action. On November 22, 1974, upon motion of the Piambino Plaintiffs, this Court ordered that the *Piambino* case should proceed as a class action on behalf of a class of Plaintiffs consisting of all persons who purchased or invested in Direct Distributorship contracts or agreements, or their equivalents, who never qualified as General Distributors, and who have not re-ordered products from Bestline since May 22, 1974.[4]

2. The Defendants have never disputed that Bestline Direct Distributorships were unregistered, or that their offer, sale and distribution occurred by the means or instrumentalities of interstate commerce, including the mails. Admissions to that effect were made in response to the Piambino Plaintiffs' First Request For Admissions filed herein.

3. Assistant Vice Presidents and Regional Directors, together with Home Office officials, constitute what in Bestline's parlance is referred to as its "Corporate Team".

4. General Distributors were excluded from the Plaintiff class because, by definition, they were paid fees, bonuses, commissions or rewards for successfully recruiting Direct Distributors and may be alleged to be brokers or dealers with respect to the Bestline Direct Distributorships, thereby creating a possible conflict of interests within the Plaintiff class. Likewise, those Direct Distributors who repurchased Bestline products within six months preceding the class action order were excluded on the assumption that such persons remain active as distributors and may have an interest in Bestline's financial survival which conflicts with that of inactive Direct Distributors. Class members who previously received refunds or were part of a restitution plan arrived at in negotiations between Bestline and the Attorneys General of several states were excluded for obvious reasons.

By stipulation between the Piambino Plaintiffs and the Defendants, the latter of which sought to avoid having notice of the pendency of the class action sent to all 40,000 present and former distributors within the Plaintiff class because of the alleged disruptive effect it would have on Bestline's on-going business, a Notice of Pendency of Class Action was approved by this Court and sent by First Class mail only to those 10,000 members of the Plaintiff class who purchased or invested in Bestline Direct Distributorships after May 1, 1972, thereby embracing the calendar year preceding the earliest of those lawsuits transferred to this judicial district by the Judicial Panel on Multidistrict Litigation, and as to which persons the one-year limitation on actions contained in Securities Act § 13 does not apply. All class members whose Securities Act § 12(1) claims were not thereby time-barred would be entitled to the remedy of rescission if this Court determined that the Bestline Direct Distributorships were securities, while the nearly 30,000 remaining class members would be relegated to claims arising out of alleged violations by the Defendants of the anti-fraud provisions of the Securities Act, the Exchange Act and the rules and regulations of the Securities & Exchange Commission, as to which claims this Court denied class status except insofar as they involve an adjudication of whether the Bestline Direct Distributorships are securities. It was also stipulated that upon any determination by this Court that the Bestline Direct Distributorships constituted securities, the remaining portion of the Plaintiff class would be notified of such a ruling and would also be apprised of the effect thereof on their individual rights, including their right to initiate separate actions. In consideration of deferring notice to the remaining 30,000 class members until after any such ruling by this Court, the Defendants agreed to pay all costs of the deferred notice, while the Piambino Plaintiffs paid the cost of preparing and mailing the initial notice.

In March of 1975, this Court denied various Motions to Dismiss the class action which raised numerous objections to the Piambino Plaintiffs' Second Amended Complaint, as well as Motions For Summary Judgment filed by several Defendants.[5] This Court believed that the Motions For Summary Judgment were at that time premature because of the then undeveloped state of the record.

Thereafter, the parties engaged in nearly twelve (12) months of extensive discovery. Thirteen separate sets of Interrogatories were propounded to the various Defendants and answered. Numerous Requests for Admissions and accompanying Interrogatories were served upon the Defendants and answered. Thirty-six Depositions on Oral Examination were taken which ran to in excess of 4,500 pages, virtually all of which were of Defendants in these proceedings during four week-long sessions in San Francisco and San Jose, California, Washington, D. C. and Miami, Florida. This member of the Court personally presided over nearly three weeks of said depositions with the permission of the Judicial Panel on Multidistrict Litigation in order to expedite the completion of discovery and eliminate countless motions by various parties to compel discovery. The Interrogatories, Requests For Admissions and Depositions on Oral Examination of the parties and witnesses extended to the furthest reaches of Bestline's operation, as well as businesses subsequently organized or controlled by its present and former principals, and many former Corporate Team members.

Upon completion of the aforesaid discovery, the Piambino Plaintiffs moved this Court pursuant to F.R.Civ.P. 56 to enter partial summary judgment in favor of the Plaintiff class, and against the Defendants, on the sole issue of whether the Bestline Direct Distributorships are securities in the nature of investment contracts. Although the Piambino Plaintiffs have suggested several theories to reach the legal conclusion

---

**5.** The disposition of the Motions to Dismiss and earlier Motions For Summary Judgment is re-ported at CCH Fed.Sec.L.Rep. ¶ 95,070 (S.D. Fla., March 21, 1975).

that the Direct Distributorships constituted securities within the meaning of the Securities Act and the Exchange Act, the only theory pursued by them in support of their First Motion For Partial Summary Judgment is based in substantial part upon an application of the law expressed by the United States District Court for the District of Oregon in *Securities & Exchange Commission v. Glenn W. Turner Enterprises, Inc.,* 348 F.Supp. 766 (D.Or.1972), aff'd, 474 F.2d 476 (9th Cir. 1973), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1974), followed by the Fifth Circuit Court of Appeals in *Securities & Exchange Commission v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir. 1974), and also followed by at least two District Courts in *Securities & Exchange Commission v. Bull Investment Group, Inc.,* CCH Fed.Sec.L.Rep. ¶ 95,010 (D.Mass., March 10, 1975), and *Securities & Exchange Commission v. JET Travel Services, Inc.,* CCH Fed.Sec.L.Rep. ¶ 95,317 (M.D.Fla., Aug. 29, 1975). All of the foregoing cases applied the Federal securities laws to multi-level sales organizations.

In response to the Piambino Plaintiffs' First Motion For Partial Summary Judgment, the principal Defendants joined in their own Motion For Partial Summary Judgment which sought dismissal of these proceedings on the limited grounds that because the Plaintiff class members received soap products from Bestline in consideration of their investment, as a matter of law no security can be found to exist.

The Piambino Plaintiffs contend that the Defendants' Motion For Partial Summary Judgment should be denied, and further submit that there is no genuine issue as to the material facts relevant to the entire issue of whether the Bestline Direct Distributorships constitute securities in the nature of an investment contract within the meaning of the Securities Act and the Exchange Act, and that partial summary judg-

ment on that issue should be entered by this Court in favor of the Plaintiff class, and against the Defendants. For the reasons hereinafter set forth, we agree.

## APPLICABLE PRINCIPLES OF FEDERAL SECURITIES AND SUMMARY JUDGMENT LAW

■ Since November 24, 1971, it has been clear that multi-level sales organizations may be subject to the Federal securities laws.[6] On that date, the Securities & Exchange Commission (hereinafter referred to as "the Commission") issued its Release No. 5211, entitled "Applicability of the Securities Laws to Multi-Level Distributorship and Pyramid Sales Plans". 17 C.F.R. 231.-5211. In that Release, the Commission advanced its view that the Federal securities laws may be applicable to certain multi-level sales organizations, and thereafter commenced several successful enforcement actions based upon that contention. *Securities & Exchange Commission v. Glenn W. Turner Enterprises, Inc.,* 348 F.Supp. 766 (D.Or.1972), 474 F.2d 476 (9th Cir. 1973), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1974); *Securities & Exchange Commission v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir. 1974); *Securities & Exchange Commission v. Bull Investment Group, Inc.,* CCH Fed.Sec.L.Rep. ¶ 95,010 (D.Mass., Mar. 10, 1975); and *Securities & Exchange Commission v. JET Travel Services, Inc.,* CCH Fed.Sec.L.Rep. ¶ 95,317 (M.D.Fla., Aug. 29, 1975).[7]

Before the decision of the United States District Court for the District of Oregon in *Securities & Exchange Commission v. Glenn W. Turner Enterprises, Inc., supra,* the leading and most-often cited authority for determining what forms of economic relationships constitute "investment contracts" within the meaning of the Federal securities laws was the decision of the Supreme Court in *Securities & Exchange Commission*

---

6. For an exhaustive discussion of the development of the applicability of securities laws to multi-level distributorships and pyramid sales plans, see *Pyramid Schemes: Dare To Be Regulated* 661 Geo.L.J. 1257 (1973).

7. All of the reported decisions involved multi-level sales organizations.

*v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In its opinion in the *Howey* case, the Supreme Court stated that " . . . an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third-party . . . ." 328 U.S. at 298–299, 66 S.Ct. at 1103, 90 L.Ed. at 1249.

After the decision in *Howey*, the Commission, as well as the Courts which subsequently applied the law announced therein, expressed their recognition that the significant wording in the *Howey* definition of an investment contract was not the word "solely", but rather the word "efforts".

The decision of the Oregon Court was the first to apply the reasoning that the word "solely" in the *Howey* decision did not relate to the *quantum* of the investor's efforts, but the relative *quality* of the efforts contributed by the investor and the promoter, or a third person. The reasoning of the Oregon Court was compelled by the *Howey* Court's earlier admonition that the definition of a security " . . . embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits." 328 U.S. at 299, 66 S.Ct. at 1103, 90 L.Ed. at 1250.

The Oregon Court accorded to the *Howey* test the degree of flexibility originally contemplated by the Supreme Court to effect the important remedial purposes of the Federal securities laws, without plying uncharted waters by adopting the approaches taken by several state courts in the application of their Blue Sky laws, or the reasoning of the Commission in Release No. 5211, which relied heavily upon such decisions.[8]

The effort of the Oregon Court to apply the *Howey* test to the Dare To Be Great multi-level sales scheme devised by Florida promoter Glenn W. Turner was subsequently affirmed by the Ninth Circuit Court of Appeals, and followed by the Fifth Circuit in *Securities & Exchange Commission v. Koscot Interplanetary, Inc., supra*, which reversed the decision of the United States District Court for the Northern District of Georgia because that Court emphasized the *quantum* of the investor's efforts, rather than the relative *quality* thereof, in evaluating another Turner scheme. In affirming the decision of the Oregon Court, the Ninth Circuit Court of Appeals stated:

> We hold . . . that the definition of securities should be a flexible one, the word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically . . . .
>
> \* \* \* \* \* \*
>
> We adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise. 474 F.2d at 482.

And in reversing the Georgia Court, the Fifth Circuit held likewise. 497 F.2d at 485.

The direction charted by the Oregon Court, and followed by the Ninth and Fifth Circuits in elaborating upon the *Howey* test, received recent expression in *United Housing Foundation v. Forman*, 421 U.S. 837, 851–54, 95 S.Ct. 2051, 2060–61, 44 L.Ed.2d 621, 632–33, 43 U.S.L.W. 4742, 4747 (June 17, 1975), wherein the Court synthesized the law relating to investment contracts and restated the *Howey* principle in the following language: "The touchstone [of an investment contract] is the presence of an investment in a common venture premised on a reasonable *expectation* of profits to be derived from the entrepreneurial or managerial efforts of others [Emphasis added]". By focusing on the *quality* of the efforts of others, the Supreme Court

---

8. Likewise, the Supreme Court declined the invitation in *United Housing Foundation v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621, 43 U.S.L.W. 4792 (1975), to import the "risk capital" theory into Federal securities jurisprudence.

read the word "solely" out of the *Howey* test, it having become so much surplusage, thereby according to its prior *Howey* decision the flexibility originally intended.

■ A review of the decisions of the District and Appellate Courts including the Supreme Court, in recent cases applying the *Howey*-generated test for an investment contract reveals four essential elements which must be found to be present in any economic relationship to give rise to the existence of an investment contract, thereby bringing such relationships into the ambit of Federal securities regulation. Those elements are: (1) An investment of money, or tender of initial value; (2) in a common enterprise or venture; (3) with a reasonable expectation of profits; (4) to be derived from the undeniably significant, or essential managerial or entrepreneurial efforts of others which affect the failure or success of the enterprise.

■ The Piambino Plaintiffs ask this Court to measure the material facts developed in these proceedings against a yardstick comprised of the foregoing elements of an investment contract. Based upon established principles of law applicable to summary judgments under F.R.Civ.P. 56, they insist, and we agree, that there is no genuine issue as to any material fact with respect to the issue of whether the Bestline Direct Distributorships constitute investment contracts within the meaning of the Federal securities laws. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). In so doing, we draw all reasonable inferences derivable from such facts favorably to the Defendants. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

In applying the applicable principles of the Federal securities laws and settled principles of summary judgment law to the facts involved in these proceedings, we note at the outset that virtually all of the facts of record herein are contained in a multitude of responses by the Defendants to discovery initiated by the Piambino Plaintiffs. There are no independent witnesses whose observations, knowledge or testimony is relied upon by the Piambino Plaintiffs in support of their First Motion For Partial Summary Judgment, and virtually all of the facts material to the so-called "securities issue" were elicited by the Piambino Plaintiffs from the Defendants themselves through reams of discovery documents, including lengthy depositions, which touched upon virtually every aspect of Bestline's business.

The mere extensiveness of the record, however, as well as the complexity of the facts and theories of law involved in these proceedings, have been heavily relied upon by the Defendants in opposing the Piambino Plaintiffs' First Motion For Partial Summary Judgment. The Defendants argue that there is a plethora of disputed facts which preclude this Court's determination of the securities issue by an interlocutory summary adjudication.

Despite the extensiveness of the record, the volume of facts contained therein, and the variety of far-reaching inferences which the parties urge this Court to draw therefrom, we have scrupulously limited this summary disposition of the securities issue to a consideration of only the *material* facts of record and the inferences which may be *reasonably* drawn therefrom, viewing all such facts and inferences in a light most favorable to the Defendants. By this strict and careful application of the standards required to be applied in summary adjudications, the facts and inferences to be considered to determine the Piambino Plaintiffs' First Motion For Partial Summary Judgment are dramatically reduced in number and scope.

Based upon our detailed review of the record in these proceedings, carried out in accordance with the foregoing principles applicable to summary adjudications, we hold that any specific factual controversies which are asserted in these proceedings involve facts which are immaterial to the issue of whether Bestline's Direct Distributorships constitute investment contracts, or the components of that issue as set forth hereinabove, either because any such facts

are irrelevant to the issue before this Court or because they lack any uniformity of impact upon the class Plaintiffs. *Securities & Exchange Commission v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478 (5th Cir. 1974).

With the foregoing principles of law in view, we hereby apply them to the material facts involved in these proceedings.

## BESTLINE'S GROWTH AND DEVELOPMENT

Bestline's business began in August of 1966 when William E. Bailey and Jerry G. Brassfield (hereinafter referred to as "Bailey" and "Brassfield", respectively), two of the Defendants in these proceedings, joined forces to organize a multi-level direct sales organization to sell and distribute a line of bio-degradable soap products previously developed by one William Boudreau, a chemist. Prior thereto, Bailey and Brassfield had been associated as distributors for Holiday Magic, Inc., a multi-level direct sales company involved in the distribution of cosmetic products, which itself later became the object of numerous private and public suits and regulatory action.

Bailey and Brassfield had been involved in multi-level direct sales organizations prior to their Holiday Magic experience. Both had participated in the distribution of food supplements as part of the Nutri-Bio organization, and Bailey, together with William Penn Patrick, the founder of Holiday Magic, Inc., made an unsuccessful prior joint effort to establish a similar company in the corporate form of Ad-Mark, which later became insolvent.

Bestline was a successful venture from its inception. Led by Bailey and Brassfield, with the assistance of other persons who had multi-level direct selling experience, Bestline began the distribution of its line of bio-degradable soap products through a fledgling network of independent distributors who occupied various levels of its multi-level sales organization. Bestline grew rapidly and in October of 1968, in order to share the ownership of the company with other loyal and devoted participants in its direct sales program, Bailey and Brassfield organized the Bestline Corporation and sold their interest in Bestline Products, Inc. to the new corporation for $10 million, also retaining majority ownership of that new company, while admitting others to minority ownership.

Until August of 1973, Bailey at all times remained the chief executive officer and Chairman of the Board of Directors of Bestline, while Brassfield departed the organization in 1970, either as a result of a dispute over company policy or to seek greener pastures where he could achieve his own brand of independence. Bestline grew both in the number of distributors promoting and distributing its products, as well as geographically, and eventually was operating in all fifty states and several foreign countries.

During Bestline's growth and development, it attracted the attention of various law enforcement officials and regulatory agencies, including the Federal Trade Commission. Early in its history, Bestline entered into a consent decree with the Federal Trade Commission wherein it agreed to cease and desist from certain alleged unfair trade practices in connection with the recruitment of new distributors, and responded likewise to similar charges initiated by various state Attorneys General. As a result, occasional changes were made in Bestline's multi-level sales program claimed to bring it into conformity with applicable state and Federal laws. Whether it successfully did so is not within the province of this Court to determine, nor were the changes made material to the issues in these proceedings.

In 1973, the Attorney General of the State of California obtained a civil judgment against Bestline, as well as certain individual Defendants herein, in the amount of $11 million arising out of violations by Bestline of California laws relating to deceptive trade practices. The company promptly filed an Original Petition under Chapter XI of the National Bankruptcy Act and sought the protection of the Federal Courts, but subsequently withdrew its peti-

tion after it successfully negotiated with the California Attorney General an arrangement to pay the $11 million judgment over a number of years, and after Brassfield effected a successful tender offer to acquire control of the company. In connection therewith, Bailey resigned and has remained retired from the business, while Bestline ostensibly eliminated the objectionable features of its multi-level direct sales plan and continues to do business through several thousand distributors.

Despite Bestline's travails, it grew to have some of the earmarks of a successful national business enterprise. Its initial meager line of cleaning agents and home care products expanded to 16 such products by March of 1972, six of which were manufactured in one or both of Bestline's manufacturing facilities in San Jose, California and Elk Grove Village, Illinois. Each such facility encloses in excess of 60,000 square feet, and the company rented or leased other regional distribution centers for its products. The remaining products were manufactured by others for Bestline in accordance with its specifications.

Bestline executives were transported throughout the United States on corporate aircraft and Corporate Team meetings sometimes took place on the company yacht, or at its ranch in northern California. Indeed, at its acme, Bestline's chief executive officer, William E. Bailey, received the Horatio Alger Award voted to successful entrepreneurs who exemplify the "American dream", which dream, coincidentally, Bestline claimed to offer to prospective distributors.

Bestline's officers' individual annual compensation ran into the hundreds of thousands, if not millions, of dollars, and Corporate Team members experienced annual earnings into six figures. By virtue of their earnings, they were eligible to be in-

ducted into either the "Chairman's Club", or the "President's Club", depending upon the magnitude of their success, as well as those of Bestline's distributors who qualified, and their status was constantly held out as an example to Bestline's network of independent distributors who were exhorted to do likewise. Such "success stories" were an essential element in Bestline's promotion of the business opportunity offered by participation in its National Marketing Plan.

### THE BESTLINE NATIONAL MARKETING PLAN

Central to Bestline's success, as well as its past legal problems, was its "National Marketing Plan" which consisted of a network of independent distributors who functioned at various levels in its direct-sales organization.

For the most part, the Bestline National Marketing Plan was implemented through a heirarchy of three levels of independent distributors. Persons at the lowest or middle level were denominated "Local Distributors",[9] while those at the second or middle level were denominated "Direct Distributors". Those at the third and highest level of attainment were called "General Distributors". Neither the Local nor General Distributorships are involved in these proceedings. Any Bestline distributor could sell Bestline products anywhere in the United States, without limitation.

The Local Distributor was never required by Bestline to make any significant investment of money to procure his position and to exercise the rights attendant thereto.[10] The Local Distributor was eligible to sell Bestline products to the consuming public at retail prices and purchased them through his sponsoring Direct Distributor at a discount, the difference being his or her commission.[11] He could also recruit other Local

---

**9.** Early in Bestline's history, the lowest level, later known as a Local Distributorship, was characterized by two levels successively denominated Sub-Distributor and Retailer. Ultimately recognizing that the two levels were not functionally unique, Bestline consolidated them into the single position of Local Distributor. Like the Local Distributorship, neither of its predecessors are involved in these proceedings.

**10.** The Local Distributor qualified as such by paying $5 annual association dues. No product purchase was required.

**11.** The Local Distributor's commission rate was progressive in nature, ranging from 30% to 52%, depending upon his personal sales during any calendar month. The Local Distributor received the 52% discount (the same as that

Distributors who could effect such sales for him.

The Direct Distributor, on the other hand, was required to pre-purchase a substantial quantity of Bestline products and sales aids in order to qualify for his position and to exercise the rights attendant thereto.[12] Such rights included purchasing Bestline products, in some cases, at a greater discount than the Local Distributor,[13] as well as the right to "build an organization" of Local Distributors on whose selling efforts he could earn a profit. Of greatest significance to these proceedings, however, is the right vested in the Direct Distributor to recruit other Direct Distributors and thereby qualify to elevate himself to the position of General Distributor and to receive certain monetary bonuses or rewards in connection therewith.[14]

The General Distributorship could be attained only by those persons who first qualified as Direct Distributors and satisfied certain other requirements. The General Distributor had the right to purchase Bestline products at the greatest available discount,[15] and to "build an organization" of Direct Distributors and Local Distributors beneath him on whose selling and recruiting efforts he could earn a profit.

Despite the formality of their separate designations, Direct and General Distributorships are not fundamentally unique or discrete entities. Although they are separated by a differential of 8% in the respective rates of discount at which they purchase Bestline products, both Direct and General Distributors may sell directly to the consuming public, or through Local Distributors on whose selling efforts they can earn a profit. Yet the General Distributorship cannot be attained independently from a Direct Distributorship, i. e., a prospective distributor cannot enter the Bestline National Marketing Plan at its highest level. He must first become a Direct Distributor, even if only for a brief period of time. The fundamental difference in character between a General Distributor and a Direct Distributor is largely based upon the fact that General Distributors have successively recruited a requisite number of new Direct Distributors to qualify as such, while Direct Distributors have either not attempted to recruit new Direct Distributors in requisite number, or have been largely unsuccessful in any such attempts. In short, the General Distributorship is to the Direct Distributorship as a butterfly is to a caterpillar; the same being an advanced state of maturity or development of the other.

Until January of 1970, a Bestline Direct Distributor could qualify as a General Distributor by recruiting a new pre-purchase Direct Distributor to replace himself in his sponsoring General Distributor's "organization", and by paying to Bestline a $2,750 "release fee", ostensibly to release himself from his General Distributor's organization and to compensate that General Distributor for the loss of commissions which he would experience when the released Direct Distributor left the releasing General Distributor's organization to head his own organization as a new General Distributor. Bestline

---

enjoyed by a pre-purchase Direct Distributor) when his monthly sales exceeded $4,800. If he attained $5,600 in sales, the Local Distributor became a Direct Distributor, having "worked-in" to that position.

**12.** The actual dollar amount required to be paid to Bestline varied from time to time, but averaged in excess of $3,000. The range of variations is immaterial to the fundamental issues involved in these proceedings.

**13.** The Direct Distributor purchased Bestline products at a purported 52% discount rate.

**14.** In their Briefs, the Defendants criticize the Piambino Plaintiffs for assimilating the Direct and General Distributorships insofar as recruiting activities, and compensation therefor, are involved. However, both positions involved the recruitment of new Direct Distributors, the only difference being that the Direct Distributor who successfully recruited two new Direct Distributors received no remuneration therefor, because the two successive recruitments merely qualified him to become a General Distributor. Thereafter, successive recruitments accorded the distributor a direct pecuniary benefit.

**15.** The General Distributor purchased products from Bestline at a purported 60% discount.

paid $2,250 of the $2,750 release fee to the rising Direct Distributor's former General Distributor who recruited or sponsored the released Direct Distributor in the first instance.

After January of 1970, the payment of release fees was discontinued, and the upwardly-mobile Direct Distributor could satisfy the requirements necessary to rise to General Distributor by first recruiting a new Direct Distributor to replace himself in his sponsoring General Distributor's organization, by generating sales volume of $5,000 in a single month,[16] and paying a $600 fee to Bestline for attendance at a so-called "General Distributor's School". The additional requirements for advancement which replaced the release fee, however, fell far short of compensating for the income which the release fee had accorded General Distributors.

The establishment of the Special Incentive Bonus (SIB) plan responded to the need to fill the void left by the abandonment of the release fee. Special Incentive Bonuses were paid to General Distributors annually and were determined on a progressive basis by the annual sales volume in Bestline products for which the General Distributor was responsible, directly or indirectly. Because of its unique "profit-sharing" qualities (Bestline referred to it as a profit-sharing plan), the Special Incentive Bonus plan especially highlights the distinctive feature of the Bestline National Marketing Plan, which was, at every level, the payment of bonuses or commissions to distributors based upon "product movement" measured in "Refund Bonus Volume" (RBV), a fictitious value assigned to Bestline products upon which commissions and bonuses were computed.

Product movement effected by Local Distributors was necessarily between the Local Distributor and his customer. No commissions or bonuses were paid by Bestline to the Local Distributor. The Local Distributor purchased Bestline products from his sponsoring Direct Distributor at a discount, and could sell them at whatever price he chose, subject to contract restrictions, but without any real control by Bestline over the retail prices. Because Local Distributors make no initial investment, either in product or otherwise, this aspect of Bestline's National Marketing Program does not run afoul of the Federal securities laws, nor is it alleged by the Piambino Plaintiffs to offend those laws.

Product movement effected by Direct and General Distributors, however, is more complex. Inasmuch as Direct and General Distributors are exhorted to "build their organizations" by recruiting yet other distributors who pre-purchase substantial quantities of Bestline products, the commissions and bonuses paid in connection with the substantial product movement from Bestline into the hands of such new distributors constitutes remuneration for the recruitment of others into the Bestline National Marketing Plan. Although the concept of "product movement" obscured any distinction between the movement of Bestline products into the hands of the consuming public as against movement into the hands of distributors, or among them, Bestline's parlance made a distinction between "retail" and "wholesale" business. Retail business involved precisely that, product movement into the hands of the consuming public. Wholesale business, on the other hand, involved product movement between distributors, or from Bestline into the hands

---

16. The requisite sales volume could be generated by simply recruiting a second Direct Distributor for the sponsor's own organization, or by relying on either his own or his Local Distributors' retail sales, if any, or both. A later variation of the process of becoming a pre-purchase Direct Distributor involved the purchase of $500 of Bestline products directly from the Direct Distributor's sponsoring General Distributor, or his sponsor's sponsoring General Distributor if the sponsor is only a Direct Distributor, and the balance of the pre-purchase requirement from Bestline. Although no motivation is assigned to this variation, it made it possible for a pre-purchase Direct Distributor to dispose of his entire initial inventory in $500 increments to newly-recruited Direct Distributors (after the first two such recruitments qualified him as a General Distributor) thereby recouping his investment without ever having to sell Bestline products to the consuming public.

of new distributors. The latter component of wholesale business, of course, was generated by recruitment activities. Commissions and bonuses were paid on *all* product movement generated by Bestline distributors measured in RBV, without distinction between wholesale or retail business. By creating the fictions of "product movement" and "wholesale business", Bestline could state in its Business Opportunity Booklet provided to prospective distributors that "No compensation of any kind will be paid for the solicitation or recruitment of others". This self-serving declaration, however, relies upon those important terms to put a gloss on the underlying recruiting or "organization building" transactions which, in fact generated the "product movement" or "wholesale business" on which commissions and bonuses were paid.

Every Bestline distributor, at whatever level, had a "sponsor" to whose "organization" he was assigned, even if the sponsor resided hundreds or thousands of miles away. Each Direct Distributor Application required an identification of the applicant's "sponsoring" distributor for the purpose of paying commissions or bonuses on the product movement generated by his recruitment. Bestline thereby developed a complex system of accounting for the responsibility for sponsorship of new distributors which was ultimately computerized, and the hard-copy output which recorded the payment of commissions and overrides on product movement through the chain of distributors was referred to in Bestline's parlance as "linkage reports". Bestline's computer also generated 3% and 8% "commission statements" to its distributors, from which data the company also paid the commissions set forth therein.

Upon review of the foregoing facts, all of which were elicited by the Piambino Plaintiffs from the Defendants themselves, this Court discerns four different methods by which Bestline distributors could profit from the recruitment of new distributors. Those four methods included: (1) the release fee; (2) the "standard" commission; (3) the "override" commission; and (4) the Special Incentive Bonus (SIB).

The release fee practice, which was abandoned in 1970, was the simplest method by which the Bestline investor profited from the recruitment aspect of the National Marketing Plan. As discussed previously, a rising Direct Distributor was required to pay a $2,750 fee to Bestline as a condition precedent to attaining the status of a General Distributor. Bestline retained $500 and paid $2,250 to the Direct Distributor's sponsoring General Distributor. By this technique, Bestline induced advancement from Direct Distributor to General Distributor. The "release fee", in effect, was a deferred method of compensating one distributor for sponsoring another distributor, subject only to the condition that the recruiting and the recruited distributors must ultimately become General Distributors.

Because of the differential in the rates of discount between General and Direct Distributors (60% and 52%, respectively), each sponsoring General Distributor was entitled to an 8% standard commission on "product movement" to or through each Direct Distributor sponsored by him, including the Direct Distributor's initial pre-purchase of Bestline products. The fact that the Direct Distributor may reside hundreds or thousands of miles away would not deprive his sponsoring General Distributor of his vested right to receive the 8% standard commission. In many cases, a new pre-purchase Direct Distributor would request that only half (or none) of an initial product inventory be shipped to him. In such cases, it made no difference as to the payment of the 8% standard commission on such product movement. The General Distributor was still entitled to receive the commission, and Bestline paid it, even though the products may never have physically moved at all.

In each case, Bestline accounted for all such transactions, received the funds and disbursed the commission payments to the beneficiaries of the program.

In addition to the 8% standard commission, Bestline offered and paid a 3% override commission to the sponsor of a sponsoring distributor, i. e., the distributor once-re-

moved up the chain of distributors.[17] The sponsor of a sponsoring distributor was entitled to the 3% override commission solely by virtue of his initial sponsorship of the sponsoring distributor, even though he may have had no involvement in the subsequent recruitment. As with the 8% standard commission, the 3% override commission was paid whether the product was shipped or not.

The system of 3% override commissions was likewise administered by Bestline, and payments were remitted by the company on a monthly basis.

After the release fee feature of Bestline's National Marketing Plan was eliminated in 1970, the 8% standard commission differential and the 3% override commission remained as the sole inducement for the Direct Distributor to rise to the General Distributorship level. Bestline enhanced the attractiveness of advancing to the General Distributorship position by implementing the Special Incentive Bonus (SIB) plan. The SIB was represented by Bestline to be a profit-sharing program.

SIB's were paid on an annual basis to qualifying distributors. The actual sum or sums of money paid was determined on a progressive scale as a percentage of product movement measured in RBV. The greater an individual distributor's annual RBV, the greater would be his annual SIB expressed as a percentage of the total annual RBV. Although annual RBV could consist of product movement through the distributor to the consuming public, it could also consist of product movement to newly-recruited distributors. No differentiation was made by Bestline, nor was any attempt made to measure the quantity of Bestline products which actually flowed to the consuming public until the so-called "Cameo" program was developed in 1971 in response to criticism by regulatory agencies that the Bestline National Marketing Plan resulted

in "garage loading" of its products in the possession of its distributors.

The average RBV generated by the recruitment of a new Direct Distributor, who later became a General Distributor, was about $15,000.[18] Whereas under the discontinued release fee program a General Distributor would be paid a 13% or $2,000 commission on a Direct Distributor who subsequently advanced to the General Distributor position, under the SIB program the General Distributor had to account for at least $36,000 RBV to be eligible for any commissions at all. At that level, the General Distributor's commission would 3.3% of his RBV. However, if the General Distributor successfully accounted for an annual RBV of $200,000, his commission rate would escalate to 15% of RBV, or $30,000. Thus, the General Distributor who recruited thirteen new Direct Distributors in any given calendar year would be in essentially the same position under the SIB plan as in the discontinued release fee program.

Of course, the new SIB plan had the disadvantage of making it necessary for the sponsoring General Distributor to recruit a greater number of Direct Distributors in order to receive the equivalent bonus expressed either as a percentage of RBV or in dollars, but it had the advantage of paying to a General Distributor a commission for the recruitment of a new Direct Distributor, even where the Direct Distributor subsequently failed to advance to the General Distributor level.

When the SIB plan is viewed in conjunction with the requirement that an advancing Direct Distributor recruit a new Direct Distributor to replace himself in his sponsor's "organization", it appears that his sponsoring General Distributor is credited with the RBV for the ensuing product movement, and that all such RBV is aggregated for the purpose of determining the

17. The 3% override commission was discontinued by Bestline in 1972.

18. The figure is attained by aggregating the RBV of each pre-purchase Direct Distributor's

initial product purchase and the product movement, measured in RBV, generated by meeting all of the requirements for advancement to the position of General Distributor.

sponsoring General Distributor's annual SIB. Hence, the General Distributor can qualify for and be paid an annual SIB based *solely* upon the recruiting efforts of Direct Distributors in his organization who seek to advance themselves to the position of General Distributors, and who thereby seek to be eligible for the "windfall" profits of the scheme.[19]

In short, the abandonment of the release fee and the substitution of the SIB plan changed nothing except the form of the transaction. If anything, it removed from the conditions precedent to the payment of such bonuses any requirement that a General Distributor shepherd a newly-recruited Direct Distributor through the recruitments necessary to be accomplished by him to advance to the General Distributorship position, further eliminating, as a practical matter, any need for the General Distributor to exert any efforts at all.

Based upon the foregoing analysis of the facts, it is plain that the Direct and General Distributorships possess at least two attributes of the four which are necessary components of an investment contract. The Direct Distributor, through his pre-purchase of Bestline products, pays money to Bestline as a condition precedent to his ultimate eligibility as a General Distributor to receive payments in the form of profit on his investment. It is also undisputed that Bestline managed the entire system of receiving, accounting for and disbursing such profits. Bestline's centralized administration of its network of independent distributors thereby also constitutes a significant element of the participation of its distributors in a "common enterprise or venture", or the third of the four necessary components of an investment contract.

In their countering Motion For Summary Judgment, the principal Defendants maintain that there is no genuine issue as to the fact that each pre-purchase Direct Distributor received soap products and sales aids in exchange for his or her investment in Bestline, but argue that upon that fact alone an investment of money is negated. The moving Defendants thereby urge this Court to adopt a mechanical and simplistic notion of the Federal securities laws which prefers form over substance and ignores the economic realities of the transaction in Bestline Direct Distributorships.

Unquestionably, each member of the Plaintiff class paid money to Bestline in consideration not only of the quantity of Bestline products to be shipped to him (or reserved for him), but as a condition precedent to be eligible to act as a pre-purchase Direct Distributor, including the exercise of all rights and privileges attendant thereto. Whether the rights and privileges attendant to a Bestline Direct Distributorship piggy-backed with the product pre-purchased, or vice versa, is immaterial to the disposition of these proceedings. The fact is undisputed that in no way other than the pre-purchase of Bestline products[20] can a Plaintiff class member be eligible to exercise the rights and privileges which vest in a Bestline Direct Distributor. Those rights,

**19.** The illustration carries the proposition to an extreme conclusion. It is intended only to illustrate the point, and is not relied upon in making disposition of the securities issue herein by interlocutory summary adjudication. This Court has been scrupulous to avoid drawing any inferences from the material facts which assume that Bestline's product movement was generated primarily from recruitment, rather than retail sales, or vice versa. The actual relationship between these two aspects of Bestline's National Marketing Plan, insofar as the respective emphasis between them is concerned, is not a material issue herein.

**20.** The possibility of a Local Distributor becoming a "work-in" Direct Distributor was dis-

cussed previously at Note 11, *infra*. For the purpose of this analysis, the pre-purchase and work-in methods of attaining Direct Distributorship status are indistinct. Work-in Direct Distributors are not members of the Plaintiff class by definition. The former qualified by expending either his own or borrowed funds to pre-purchase Bestline products in required quantity, while the latter pre-sells in a single calendar month essentially the same volume of Bestline products required to be pre-purchased by the former. The point made is that the rights and privileges of a Direct Distributorship were not offered by Bestline separate and apart from the specified volume of product movement, however, created. Such rights were neither "given away", nor sold for a separate consideration.

and the eligibility of the Plaintiff class members to exercise them, are a basic and fundamental part of the consideration for the transaction which forms the economic relationship between Bestline and the investor. Clearly, the Plaintiff class members did not purchase thousands of dollars in Bestline products for their own use or consumption, but for re-distribution to either the consuming public or other distributors, or simply to store in their garages while they devoted their time to "building their organizations", which, in Bestline's parlance, meant the recruitment of other distributors.

For the foregoing reasons, we hold that the transaction between Bestline and the Plaintiff class members involved an investment of money, or tender of initial value, and deny the principal Defendants' Motion For Summary Judgment on that issue.

## IMPLEMENTATION OF THE BESTLINE NATIONAL MARKETING PLAN

Bestline's field organization, and its function, like its centralized administrative or clearing-house services, is an integral part of its National Marketing Plan.

Shortly after its inception, as its recruitment of new distributors grew both numerically and geographically, Bestline assembled a field organization to continue and further expand its business. There eventually developed a hierarchy of field positions responsible to the Vice President in charge of sales in the Home Office or corporate headquarters at San Jose, California.

Immediately under the Vice President, and directly responsible to him, Bestline established the position of Assistant Vice President. There were six Assistant Vice Presidents who were assigned specific geographic territories to supervise, usually consisting of seven to nine states. Immediately beneath the Assistant Vice Presidents in rank, Bestline established the position of Regional Director, while persons were also assigned specific smaller geographic territories to supervise, usually consisting of a single state or part thereof. And beneath the Regional Director in responsibility, Bestline created the position of Area Coordinator, and sometimes Assistant Area Coordinator. Each Area Coordinator reported to a Regional Director, and was assigned to a specific geographic territory to supervise, usually consisting of several smaller medium-sized cities, or parts of large ones. Their duties included organizing and presenting Opportunity Meetings, conducting training sessions for distributors, supplying data to Bestline's Home Office for its Corporate Calendar and coordinating and effectuating company policy in the field. Assistant Vice Presidents and Regional Directors were appointed and paid by Bestline, although they could also continue to perform as distributors if they so desired, and some did. Area Coordinators were appointed by Bestline and paid through its Regional Directors. The method of compensation of Bestline's field representatives changed from time to time, but always included in substantial part a commission based upon "product movement" within their assigned areas, which, of course, included the movement of Bestline products pre-purchased by newly-recruited Direct Distributors.

Key Home Office officials, Assistant Vice Presidents and Regional Directors, but not Area Coordinators, came to be known as members of Bestline's "Corporate Team". Corporate Team meetings were held monthly in a single location in the United States, at which Home Office officials, and sometimes legal counsel, reviewed existing company policies with respect to the National Marketing Plan, announced new policies, admonished the Corporate Team to enforce all policies and generally motivated each other. A consistent theme in Corporate Team meetings was enforcing adherence to scripts provided by Bestline for use at Opportunity Meetings to which distributors invited guests to become acquainted with the Bestline business opportunity as part of the exhorted goal of each distributor to "build his organization", as well as adherence to the recommended procedures by which

prospects were introduced to Bestline and its network of distributors, whether through the device of "Opportunity Meetings" or otherwise.

Like Koscot and Dare To Be Great,[21] a key feature of the Bestline National Marketing Plan was the "Opportunity Meeting" which consisted of a gathering of Bestline distributors and prospective distributors in a hotel or motel meeting room, or any other suitable meeting-place. The purpose and effect of the Opportunity Meeting was the creation of an effective vehicle by which distributors could "build their organizations" by inviting prospective distributors to receive a standardized presentation or introduction to Bestline's products and business opportunity. Although the Opportunity Meetings may not have been the exclusive vehicle utilized to introduce Bestline to prospective distributors, it was by far the overwhelmingly dominant method, the one recommended by the company, and the most effective, even though it had to be supplemented by the efforts of individual distributors to consummate sales of new Direct Distributorships in accordance with guidelines promulgated by Bestline.

Dozens, if not hundreds, of Opportunity Meetings were conducted almost daily throughout the United States. The time and place of each Opportunity Meeting was relayed to Bestline's Home Office through its Corporate Team and assembled into a single regularly-published and distributed "Corporate Calendar" for use by its distributors. By means of this vast network of standardized Opportunity Meetings, an Omaha distributor could (and was encouraged to) "build his organization" by referring friends in Seattle or Miami to a convenient Opportunity Meeting in their locale. And if the New York or Miami friend became a pre-purchase Direct Distributor he was assigned to his sponsor's organization in Omaha, which sponsor would receive the standard commission paid by Bestline on the product movement from Bestline to the newly-recruited distributor.

To insure uniformity at each of the thousands of Opportunity Meetings, Bestline distributed scripts for speakers to use at such meetings, as well as records, film strips and a Bestline Business Opportunity Booklet to be delivered to each prospective distributor. Assistant Vice Presidents, Regional Directors and Area Coordinators frequently conducted the Opportunity Meetings, or at least attended them to insure adherence to company policy. Bestline even employed a firm of private detectives to report to it as to the adherence to company policy at Opportunity Meetings, and frequently required electronic recording of such meetings for review by legal counsel.

In some areas the meetings were organized and paid for by local "cooperatives" of distributors, usually with the assistance of an Area Coordinator or Corporate Team member. Co-op members paid dues which were in turn allocated to the expense of conducting Opportunity Meetings. A distributor who did not join the co-op, or whose dues were not current, as a practical matter, could still attend and bring a prospect for "his organization", but in some areas, at least, he would be warned not to come back a second time if he was not a member in good standing of the cooperative.

There is no genuine issue that the relationship among Bestline, its Corporate Team members and Area Coordinators, the cooperatives and the Bestline distributors constituted a common enterprise or venture, whether for the sale and distribution of Bestline products to the consuming public, or for the recruitment of new distributors, and we so hold.

## THE INVESTORS' EXPECTATIONS

The pressure point of the application of the principles of Federal securities and summary judgment law to the facts of these proceedings involves the "reasonable expectations" of the class Plaintiffs with respect to their investment in Bestline Di-

---

21. *Securities & Exchange Commission v. Koscot Interplanetary, Inc., supra; Securities &* *Exchange Commission v. Glenn W. Turner Enterprises Inc., supra.*

rect Distributorships, including the locus of the undeniably significant or essential managerial or entrepreneurial efforts resulting in the payment to them of a share of the profits to be derived from the common enterprise or venture.

The Defendants have strenuously argued that the facts elicited from them in pretrial discovery unquestionably reveal that the individual investor is the locus of the undeniably significant or essential managerial or entrepreneurial efforts necessary to the success of the Bestline National Marketing Plan, and to their individual financial success. They also contend that no reasonable investor could expect or conclude otherwise, thereby removing the Bestline National Marketing Plan from the ambit of the Federal securities laws. The Piambino Plaintiffs, on the other hand, suggest that the undeniably significant or essential managerial or entrepreneurial efforts required in connection with the success of the Bestline National Marketing Plan repose in Bestline and its Corporate Team members, including Area Coordinators. In support of their respective arguments, all of the parties rely upon the extensive factual record relating to the pre-investment presentations made to the class Plaintiffs, as well as to the actual operation of the Bestline National Marketing Plan viewed from a post-investment standpoint, including a variety of inferences derived therefrom.

■ The parties' reliance upon this broad range of facts, however, is misplaced and creates a false or illusory issue in these proceedings. It is not necessary to a determination of the class Plaintiffs' expectations for this Court to consider such a broad range of facts and inferences. The elemental inquiry is the class Plaintiffs' *pre-investment* expectations as to the nature of their investments in Bestline Direct Distributorships, and whether reasonable minds can differ as to such expectations.[22] In short, the business opportunity offered by participation as a distributor in Bestline's National Marketing Plan must be viewed through the eyes of the class Plaintiffs, considering only such facts as were available to them before they made their individual investment decisions.

In this regard, it is only necessary that this Court review the facts as to the mode and manner of interesting class Plaintiffs in the business opportunity offered by participation in Bestline's National Marketing Plan, and of presenting that business opportunity to them, whether at Opportunity Meetings or otherwise. In so doing, this Court looks not only to the economic substance of the transactions in Bestline Direct Distributorships, but equally to ". . . what character the instrument is given . . . by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this [Securities Act], it is not inappropriate that promoters' offerings be judged as what they were represented to be". *Securities & Exchange Commission v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 352–353, 64 S.Ct. 120, 124, 88 L.Ed. 88, 94 (1943) [quoted approvingly in *Securities & Exchange Commission v. United Benefit Life Insurance Co.*, 387 U.S. 202, 211, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673, 679–80 (1967)]. In their joint brief, the Defendants accede to the propriety of the foregoing approach and have urged this

22. Although these proceedings also involve extensive allegations of misrepresentations and omissions of material facts in the standardized presentations of Bestline's business opportunity to prospective investors, the Piambino Plaintiffs First Motion For Partial Summary Judgment does not require this Court to determine those issues. The existence of such misrepresentations and omissions, however, may in no small measure account for the diametrically opposed factual contentions of the parties with respect to the operation of the Bestline National Marketing Plan from a post-investment viewpoint. The Defendants rely heavily upon their view of how the Bestline National Marketing Plan operated, rather than how it was presented to the prospective investors. This inquiry is necessarily limited to the pre-investment presentations made to the Plaintiff class, because it was from those presentations that the class Plaintiffs derived their expectations with respect to their investment in Bestline Direct Distributorships.

Court to adopt a narrow scope of inquiry limited to the various forms of Direct Distributorship agreements, Direct Distributorship qualification forms, the Bestline Business Opportunity Booklet, the Opportunity Meeting scripts, and product and marketing films. Such a limitation is appropriate, and this Court has restricted itself to an analysis of those documents and things with respect to this aspect of the securities issue, notwithstanding arguments advanced by all parties to these proceedings based upon a broader range of facts which, for the foregoing reasons, are immaterial to the issue.

By circumscribing the inquiry as aforesaid, and confining it to the review of such material documents and things, we find that there is no genuine issue as to the fact of what representations were made to prospective Bestline distributors through standardized presentations based thereon, whether at formal or informal meetings, or otherwise, although there is some dispute as to random or spurious representations made to the named Plaintiffs by other Bestline distributors and Corporate Team members outside the context of Bestline's standardized presentations. In reaching this conclusion, however, we have regarded as immaterial to this summary adjudication of the securities issue any testimony of the named Plaintiffs which is based upon such random or spurious representations because such representations lack any uniformity of impact on the class Plaintiffs and also because, in view of our finding, they are surplusage. Such representations merely reinforce expectations otherwise effectively created in the minds of the reasonable investor by the standardized pre-investment presentations.

There is no genuine dispute as to the fact that the class Plaintiffs, as well as thousands of others, were indiscriminately solicited to be exposed to the Bestline business opportunity, without regard to their back-grounds, education, training or individual abilities. The Defendants concede as much, and suggest merely that the quality of Bestline's training program adequately compensated for any lack of relevant experience or education, and that "a person's desire to succeed and willingness to work far exceed any educational or business background prior to Bestline." [23] These persons, drawn "from all walks of life, ethnic backgrounds, with varied educations, experience, ages and religions",[24] were then introduced to Bestline's business opportunity, either through the device of an Opportunity Meeting, or some other formal or informal presentation based upon guidelines promulgated by Bestline in its Information Manual, from which presentations they derived their expectations as to the character of an investment in Bestline Direct Distributorships.

The fact that some Bestline distributors may have obtained "prospects" by advertising in "Help Wanted" columns of local newspapers, by direct mail, or by striking up conversations on street corners, or that they may have intentionally refused to explain the Bestline business opportunity on such first contacts to heighten the prospective investor's "curiosity", may betray the motives of the Defendants in connection with the class Plaintiffs' fraud claims, but the use of such techniques are not basic to a determination by this Court as to the expectations created in the minds of the class Plaintiffs as to the character of their investments in Bestline Direct Distributorships. Similarly, zealousness at Opportunity Meetings evidenced by out-pourings of enthusiasm, speakers running or hurrying to the rostrum, exuberant applause, chanting or singing, and other conduct of a similar nature, may also bear upon the Piambino Plaintiffs' allegations of fraud and high-pressure salesmanship, but are immaterial to the basic inquiry involved in this adjudi-

---

**23.** Bestline Business Opportunity Booklet (all editions), p. 7.

**24.** This phrase, in several variations, appears in all editions of the Bestline Business Opportunity Booklet, as well as several times in each Opportunity Meeting script.

cation, thereby differentiating it somewhat from the decision of the *Koscot* and *Turner* Courts, which involved important fraud questions. The elucidation in those decisions of the high-pressure sales tactics of the promoters was directed to the Commission's claims of violations of the antifraud provisions of the Federal securities laws. In contrast, this Court is called upon only to resolve the limited issue of whether there is any genuine controversy as to the fact that Bestline's pre-investment standardized presentations, in their material aspects, created in the class Plaintiffs' minds the reasonable expectation that an investment in Bestline Direct Distributorships would lead to profits to be derived from the undeniably significant or essential managerial or entrepreneurial efforts of others which affect the failure or success of the common enterprise or venture.

The apparent lack of sophistication of the class Plaintiffs herein contrasts sharply with the decisions of other Courts which have held that specific franchise agreements involved therein were not investment contracts within the meaning of the Federal securities laws, and compares favorably with the decisions of those Courts which have found otherwise. *See* e. g., *Mr. Steak, Inc. v. River City Steak, Inc.*, 324 F.Supp. 640 (D.Colo., 1970), aff'd, 460 F.2d 666 (10th Cir. 1972) (River City Steak was not an uninformed investor, but was acquainted with the business it undertook, held not to involve the offer and sale of an investment contract); *Beefy Trail, Inc. v. Beefy King International, Inc.*, 348 F.Supp. 799 (M.D. Fla.1972) (controlling stockholder of Beefy Trail had extensive background as a businessman having owned and managed a retail department store, had an interest in a construction business, together with his attorney spent a considerable period of time negotiating with Beefy King over the terms and conditions of the ultimate purchase of a restaurant and franchise wherein some of the documents were drafted by his attorney, and was employed as a consultant to Beefy King actually working daily in its offices for a period of time, held not to

involve the offer and sale of investment contract). In evaluating the impact of the promoter's offering on the expectations of the investor, the investor's experience, training and abilities have always been considered an important starting point. In some cases it has been the dispositive issue. In these proceedings, we find that the Bestline National Marketing Plan was a highly-organized nationwide program addressed to the population at large, without discrimination or qualification as to the sophistication of the prospective investors.

There is no question that Bestline's National Marketing Plan held out to such investors the expectation of profits to be derived from participation therein. The lure of profits permeates Bestline's meeting scripts, literature and film strips which comprise its standardized presentations to prospects for its distributorships. Even a cursory review of those materials reveals that an expectation of profits was not only reasonably derivable therefrom, but that those materials exclude any other reasonable expectation. We are therefore constrained to conclude that there is no genuine issue as to the fact that the class Plaintiffs were led to expect that profits would be derived from an investment in Bestline Direct Distributorships, and that no reasonable investor could possibly conclude otherwise. In view of this finding, the disposition issue involves the reasonable investor's expectations as to the relative quality of the efforts to be contributed to the common enterprise or venture in order for him to receive a share of the proceeds therefrom.

In resolving this crucial issue, it is important to note that Bestline's Direct Distributorships are fundamentally unlike traditional business franchises. In a typical business franchise the franchisee acquires a bundle of legal rights, frequently including the right to employ in a specific geographic area, a business system developed by the franchisor, as well as intangible proprietary rights involving trade secrets, trade names, trademarks and, possibly, patents. Few franchisors require their franchisees to purchase goods or services from the franchisor

or a designated supplier in connection with the franchisee's operation of the franchised business. Although it is possible for an instrument identified as a franchise to infringe upon the Federal securities laws, traditional business franchises have been generally held to be beyond the pale of securities regulation because the franchisee's unit of what is usually a common enterprise is largely independent of the success or failure of the franchisor, or other franchisees, although the franchisor's failure or success may increase the risk undertaken by the franchisee. In short, in most cases involving allegations that a business franchise constituted an investment contract, it has been held that the franchisee's risk is not sufficiently integrated with that of the franchisor to bring such franchises within the scope of the Federal securities laws.[25]

Although distributorships may involve the acquisition by the distributor of many of the same rights involved in the traditional business franchise, distributorships generally involve rights respecting a specific product or product line manufactured or produced by or on behalf of the offering entity. The nature of the product and its distribution may require the distributor to establish and operate a separate or independently integrated business to sell the product to the distributor's customers, and to service the product, if necessary. Other distributorships may require an established place of business, but may not involve a product which requires the distributor to exercise a service function. Yet other distributorships may not require either an established place of business, or a product which involves the distributor in a service function.

The failure of the manufacturer or producer of a product subject of a distributorship may or may not destroy the distributor as an independently viable business entity. Depending upon the nature of the product involved, the distributor's business may not be destroyed if it otherwise involves the

sale of other products, or if it is easily adaptable to the sale of other products. On the other hand, if the product involved is the sole product sold by the distributor, and if his whole method of operation is inherently related to that product, the distributor's business will certainly perish in the face of the manufacturer or producer's failure. In either event, the distributorship itself is rendered worthless.

Bestline's Direct Distributorships involve a high degree of dependency upon the success of the company, or integrated risk. Without regard to the issue of Bestline's participation in the recruitment of new distributors, the company's standardized presentations lead to the inevitable expectation by the class Plaintiffs that it has developed, manufactures and successfully promotes a line of quality home and personal care products, and that it will continue to do so for the foreseeable future. An essential part of the investor's expectations is that the company will provide continuing assistance to its distributors, and will administer the system by which commission or bonuses are paid to its distributors in accordance with the representations contained in its standardized meeting scripts, literature and film strips. No other interpretation of those materials is reasonable.

The class Plaintiffs are not manufacturers or producers of soap, and the terms and conditions of their participation in the Bestline National Marketing Plan are controlled by Bestline. They expected not merely to sell soap, but to participate in the National Marketing Plan. If they had sought merely to sell soap, a Local Distributorship, which involved no investment, would have done nicely.

Although the class Plaintiffs risk may not be totally integrated with that of Bestline, the nature of the integration is such that Bestline's failure would not only render its distributorships worthless, but would effectively put the distributor out of business as a separate or independent entity. He may

---

**25.** This is not to say, however, that some franchises may not fall within the scope of the Federal securities laws because they lack other essential features of an investment contract, i. e., an investment of money or participation in a common enterprise.

be able to liquidate his inventory of soap products then on hand, but mere inventory liquidation is neither business survival nor what the authorities contemplate as the kind of managerial or entrepreneurial efforts which affect the failure or success of the enterprise or venture.

We therefore hold that the nature of the relationship between Bestline and the class Plaintiffs, as it is explained to prospective investors in the company's standardized presentations, is such that compels the reasonable expectation that Bestline had in the past, and would continue for the foreseeable future, to supply the managerial or entrepreneurial talents, skills and experience essential to the continuing development, manufacture and promotion of a salable line of home and personal care products, and to the management of its multi-level network of distributors as part of its National Marketing Plan, and that those efforts reasonably expected by the class Plaintiffs are the essence of the success of the common enterprise or venture from which they expected to derive their share of the proceeds. Reasonable minds cannot differ as to that expectation; it is compelled by Bestline's standardized presentations to the exclusion of any other reasonable expectation.

The sole remaining issue dispositive of the Piambino Plaintiffs' First Motion For Partial Summary Judgment is whether the class Plaintiffs reasonably expected to themselves contribute any essential managerial or entrepreneurial efforts to derive their share of the proceeds from the common enterprise or venture.

There is no question that the class Plaintiffs expected to contribute some efforts, in addition to their money, to receive their share of the proceeds from the successful operation of Bestline's National Marketing Plan. None of them expected "something for nothing". Many expected to "work hard", and some personally expected to sell Bestline products at retail. All of these expectations are reasonable inferences to be drawn from Bestline's standardized presentations. All of them, however, beg the question as to whether the class Plaintiffs reasonably expected to themselves contribute the undeniably significant, or essential managerial or entrepreneurial efforts which affect the failure or success of the common enterprise or venture.

■ The fact that the class Plaintiffs could not expect to receive their share of the proceeds from the common enterprise or venture unless they contributed some efforts is not inconsistent with the existence of an investment contract. In this respect, the Ninth Circuit Court's review of the *Howey* decision in *Securities & Exchange Commission v. Glenn W. Turner Enterprises, Inc., supra*, is instructive. In that decision, the Court remarked: "Let us assume that in *Howey, supra*, the sale and service agreements had provided that the buyer was to buy and plant the citrus trees. Unless he did so, there would be no crop to cultivate, harvest and sell, no moneys in which he could share. The essential nature of the scheme, however, would be the same. He would still be buying, in exchange for money, trees and planting, a share in what he hoped would be the company's success in cultivating the trees and harvesting and marketing the crop. We cannot believe that the Court would not have held such a scheme to be an investment contract." 474 F.2d at 482. The fact that the distributor's efforts may be necessary to the success or failure of the common enterprise or venture, or the individual distributor's unit thereof, does not, however, establish the quality of those efforts. Every retail merchandising outlet, for example, requires the efforts of sales personnel to achieve success, as well as secretaries, bookkeepers and a garden-variety of additional personnel customarily associated with the operation of a business enterprise. The fact that the efforts of such persons are necessary, however, does not establish that those efforts are managerial or entrepreneurial in nature, or sufficient to significantly affect the failure or success of the enterprise or venture.

The crux of the decision in *Securities & Exchange Commission v. Glenn W. Turner*

*Enterprises, Inc., supra,* is that if the efforts contributed by the investor are not "those essential managerial [or entrepreneurial] efforts which affect the failure or success of the enterprise", the efforts themselves rise to no higher status than an investment, different from money only in kind. The absence of any managerial or entrepreneurial skills or abilities from the efforts required of investors in the Dare To Be Great scheme compelled the Ninth Circuit Court to conclude that the participants in the scheme were sold the idea that they would get a fixed share in the proceeds from the sale of "Adventure" plans, and that ". . . to get that share, he invests three things: his money, his efforts to find prospects and bring them to the meetings, and whatever it costs him to create an illusion of his own affluence". 474 F.2d at 482. The *Turner* Court held that the Dare To Be Great investors' efforts did not rise in quality to the level of essential managerial or entrepreneurial efforts which affect the success or failure of the common enterprise, and thereby consisted of nothing more than a further investment to receive a fixed share of the proceeds from the efforts of Dare To Be Great. The efforts which the class Plaintiffs in these proceedings reasonably expected to contribute to the Bestline National Marketing Plan rises to no higher status.

Every class Plaintiff, with minor exceptions, became a Direct Distributor in Bestline's National Marketing Plan based upon a reading of the Bestline Business Opportunity Booklet, standardized Opportunity Meeting scripts (or variations employed by individual distributors), testimonials of "successful" distributors, and film strips. After 1970, Direct Distributorship qualification forms required the class Plaintiffs to affirmatively respond to the inquiries whether they had attended an Opportunity Meeting and whether they had received and read the Bestline Business Opportunity Booklet as a condition precedent to their eligibility to become Direct Distributors.

Although we are not here involved with a disposition of the class Plaintiffs' fraud claims, it appears from a thorough review of the foregoing documents and things, including the Bestline Information Manual which contains guidelines for distributors to respond to questions asked by prospective distributors, that precious little information of any substance was provided to the class Plaintiffs upon which they could determine what efforts, if any, they would have to contribute to derive their share of the profits from the operation of Bestline's National Marketing Plan.

The class Plaintiffs necessarily begin their evaluation of the facts provided in Bestline's standardized presentations upon the expectation that people from all walks of life, with different educations, backgrounds and experience, have become successful in Bestline. This theme was predominant in Bestline's standardized presentations. This clear expectation rules out any other expectation that individual class Plaintiffs must bring with them to Bestline any special or unique experience or ability, but that only a strong desire to succeed financially and a willingness to work hard toward that goal would be necessary.

The class Plaintiffs are, however, told that they will receive valuable training from Bestline. But they are given no details as to the substance of such training. They must inevitably expect to completely rely upon any such training to derive their share of the proceeds from the Bestline National Marketing Plan.

The class Plaintiffs could not reasonably expect that their efforts would involve predominantly the retail sale of Bestline products, for that is clearly stated in Bestline's standardized presentations to be the main job of Local Distributors. They likewise could not expect to operate a place of business and employ administrative personnel in connection therewith, or to keep customary business records, for they are specifically told in Bestline's standardized presentations that a Bestline Direct Distributor has very low overhead, consisting only of co-op dues, freight and a garage or basement to warehouse their Bestline product inventory. Although prospective distributors are told

754

of "hard work" and "great effort" required of them, the substantive representations contained in Bestline's standardized presentation de-emphasize the significance of such efforts and stress the training, assistance and guidance which they will receive from Bestline in becoming successful distributors, and how they will work together with Bestline and other distributors to so succeed.

Upon a complete review of the totality of the standardized presentations of the Bestline Business Opportunity to the class Plaintiffs, and the representations contained therein, we find that reasonable minds cannot differ in the expectation compelled thereby that the overwhelmingly dominant feature of an investment in Bestline's Direct Distributorships was the recruitment of other participants in the Bestline National Marketing Plan. Virtually every example contained in such materials relating to the high incomes that could be obtained as a Bestline distributor relied upon recruitment of other participants, whether accomplished through the device of Opportunity Meetings or at other formal or informal presentations.

In view of these findings, we hold that the fortuity of the class Plaintiffs' investments collectively is essentially dependent upon Bestline's expertise. Lacking the business acumen possessed by Bestline and its Corporate Team, the class Plaintiffs inexorably rely upon Bestline's guidance for the success of their investment. "This guidance, like the efficacy of Koscot meetings and guidelines on recruiting prospects and consummating a sale, is uniformly extended to all investors. That it may bear more productive fruits in the case of some [distributors] than it does in cases of others should not vitiate the essential fact that the success of the [National Marketing Plan] as a whole and customer investments individually is contingent upon the sagacious [management of the National Marketing Plan by Bestline and its Corporate Team]". *Securities & Exchange Commission v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974).

CONCLUSION

Based upon the review of the voluminous, complete and ample record in these proceedings, including interrogatories and answers thereto, admissions and depositions of parties, this Court concludes that there is no genuine issue as to any material fact bearing on the question of whether the Bestline Direct Distributorships offered and sold to the Plaintiff class from August 16, 1966 to August 10, 1973 were investment contracts within the meaning of the Federal securities laws, and that said distributorships were unregistered in form and offered, sold and distributed to members of the Plaintiff class by the means and instrumentalities of interstate commerce, including the mails, and as a matter of law the class of Plaintiffs is entitled to an interlocutory adjudication with respect thereto.