Thomas C. MARSHALL, Plaintiff,

v.

LAMSON BROS. & CO., a partnership,
and Alan Grigg, Defendants.

Civ. No. 4–959–D.

United States District Court,
S. D. Iowa,
Davenport Division.

Jan. 8, 1974.

Carl C. Meier, Lou L. Jurgemeyer and A. John Frey, Jr. of Jurgemeyer & Eddy, Clinton, Iowa, Ralph H. Heninger and G. P. Schutte of Heninger & Heninger, Davenport, Iowa, for plaintiff.

Melville Bowen, Jr., and George Sotos of Meyers & Matthias, Chicago, Ill., Robert V. P. Waterman of Lane & Waterman, Davenport, Iowa, for Lamson Bros.

John T. Nolan of Nolan, Lucas & Nolan, Iowa City, Iowa, and F. James Foley, Jr., Chicago, Ill., for Alan Grigg.

## MEMORANDUM AND ORDER

STUART, District Judge.

This matter is before the Court on motion of defendant Lamson Bros. & Co. (Lamson) to dismiss so much of the complaint as pertains to alleged violations of the Securities Act of 1933, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., on the ground that the discretionary commodities trading contract that underlies this law suit is not a security as that term has been defined for purposes of the above two Acts.

From April, 1967, to July, 1970, plaintiff Thomas C. Marshall (Marshall) maintained a securities account with Lamson, dealing with an employee of that firm, defendant Alan Grigg (Grigg). Marshall alleges that in July, 1970, Grigg induced him to open a dis-

cretionary commodities account with Lamson, for which account Grigg assumed full managerial responsibility. It is further alleged that in the face of Marshall's protests of complete unfamiliarity with the futures market, Grigg represented to Marshall that substantial profits could be made and that the account would be managed so as to limit Marshall's possible losses to approximately $400. Marshall, acting on Grigg's representations, authorized the opening of such an account in soybean futures and transferred money from his securities margin account to provide the funds needed to begin trading. As sometimes happens with speculative commodities, the "bottom" fell out of the soybean market and Grigg telephoned Marshall on July 29, 1970, to advise him that his commodities account was wiped out.

Marshall instituted this action on March 1, 1971, seeking $39,381.71 from Grigg and Lamson for various alleged violations of the '33 and '34 Acts and of the Commodity Exchange Act, 7 U.S.C. § 1 et seq. It is the first two asserted bases of liability that are challenged in the motion now before the Court.

The ultimate question posed by Lamson's challenge is whether a discretionary commodities account is an investment contract within the meaning of that term in the '33 and '34 Acts. On this question, there are two distinct lines of authority which have reached opposite conclusions. Milnarik v. M–S Commodities, Inc. (7th Cir., 1972), 457 F.2d 274, 276, cert. denied (1972), 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144; Wasnowic v. Chicago Bd. of Trade (M. D.Pa., 1972), 352 F.Supp. 1066, 1069; and Stuckey v. duPont Glore Forgan Inc. (W.D.Cal., 1973), 59 F.R.D. 129, 131, have held that such accounts are not securities since they lack the element of "common enterprise" required by SEC v. W. J. Howey Co. (1946), 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, because they involve no pooling of funds by investors. In contrast, Berman v. Orimex Trading, Inc. (S.D.N.Y., 1968), 291 F.Supp. 701, 702, and Maheu v. Reyn-

olds & Co. (S.D.N.Y., 1967), 282 F.Supp. 423, 426, have held that such accounts are securities.

This circuit has cited *Berman* and *Maheu* with approval in Booth v. Peavey Co. Commodity Services (8th Cir., 1970), 430 F.2d 132, 133. In *Booth,* the court held that an investor has a cause of action against a dealer for the churning of a discretionary commodities trading account under the applicable provisions of both the '33 and '34 Acts. Since *Booth* appears to state this circuit's position on the issue, it would perhaps be sufficient to rely on this authority without further amplification in deciding the instant case. *Booth* was decided prior to *Milnarik,* however, and did not address the "common enterprise" question which the 7th Circuit felt was determinative. Accordingly, the Court is of the opinion that the problem before it merits further examination.

Two related questions are suggested by the cases discussed above: (1) Is common enterprise a necessary element of an investment contract? (2) If so, does a discretionary commodities trading account satisfy the common enterprise requirement?

## I. Is common enterprise necessary?

In the landmark case of SEC v. W. J. Howey Co., *supra,* at 298–99 of 328 U. S., at 1103 of 66 S.Ct., the Supreme Court, in an opinion by Justice Murphy, stated:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . .

Again, at 301, at 1104 of 66 S.Ct., the Court repeated:

> The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.

The concept of common enterprise has been referred to on numerous occasions

by the Supreme Court since the *Howey* decision, *see, e. g.*, Tcherepnin v. Knight (1967), 389 U.S. 332, 338, 88 S.Ct. 548, 19 L.Ed.2d 564; SEC v. Variable Annuity Life Insurance Co. of America (1959), 359 U.S. 65, 72 n. 13, 79 S.Ct. 618, 3 L.Ed.2d 640, and has also been identified as an essential element of the investment contract by numerous lower courts which have adopted the *Howey* formulation. *See, e. g.*, Continental Marketing Corp. v. SEC (10th Cir., 1967), 387 F.2d 466, 470, cert. denied (1968), 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419; SEC v. Glenn W. Turner Enterprises (9th Cir., 1973), 474 F.2d 476, 481, cert. denied 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).

■ Admittedly, the Court in *Maheu, supra*, at 429 of 282 F.Supp. took the position that a discretionary account "may constitute a security even if there was no pooling arrangement or common enterprise among investors," citing 1 L. Loss, Securities Regulation 489 (2d ed. 1961); SEC v. Payne (S.D.N.Y., 1940), 35 F.Supp. 873; and SEC v. Wickham (D.Minn., 1935), 12 F.Supp. 245. In view of the emphasis placed on "common enterprise" in *Howey* and its repeated use as a criterion of investment contract in subsequent cases, however, I cannot escape the conclusion that common enterprise is a necessary element of the *Howey* definition.

Merely determining that common enterprise is required, though, does not furnish the complete answer to the problem before the Court. The term "common enterprise" as used in *Howey* is nowhere defined. What did the Supreme Court mean by that phrase? Is a pooling of funds necessary? Can common enterprise be present in a discretionary commodities trading account? These questions are considered in the next division.

II. Does a discretionary commodities trading account satisfy the common enterprise requirement?

In answering this question, the Court is mindful of the Supreme Court's admo-nition in SEC v. C. M. Joiner Leasing Corp. (1943), 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88, that "the reach of the Act does not stop with the obvious and commonplace," and of the oft-quoted directive in *Howey, supra*, at 299 of 328 U.S., at 1103 of 66 S.Ct., that the concept of security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." That these precepts are as forceful today as they were when first uttered some thirty years ago is made clear by the actions of the 9th Circuit in Glenn W. Turner Enterprises, *supra*, where the Court was faced with the necessity of construing another facet of the *Howey* definition—that profits come "solely" from the efforts of persons other than the investor. Relying on the remedial nature of the securities laws and the commands of *Howey* and *Joiner*, the court repudiated what it characterized as a dogmatic approach to the problem and held that the investment interest before it satisfied the "solely" requirement, notwithstanding the fact that investors in the scheme before the court were required to contribute not only money but personal efforts, as well. Any other approach to the problem would have led to "unrealistic" results. 474 F.2d at 483.

■ So it is with the problem before this Court. While the *Milnarik* interpretation of *Howey* is certainly a reasonable one in view of the language used in *Howey*, the emphasis placed on "pooling of funds" by the *Milnarik* court as the only way in which the requirement of common enterprise can be satisfied appears to be just such a "strict or literal limitation on the definition of investment contract" as was decried by the court in *Glenn W. Turner*. An examination of the authorities relied on by the *Howey* Court suggests that the Court intended no such emphasis on pooling. Admittedly, the case most heavily relied on by the *Howey* Court, State v. Gopher Tire & Rubber Co. (1920), 146 Minn. 52,

177 N.W. 937, involved a group of investors that pooled their funds, but nowhere in the opinion did the Minnesota court discuss pooling as an essential ingredient of an investment contract. An investment contract merely required a "placing of capital or laying out of money in a way intended to secure income or profit from its employment". Id. at 56, 177 N.W. at 938.

That pooling was not an essential ingredient of Minnesota investment contract is made clear by the subsequent decision of State v. Evans (1922), 154 Minn. 95, 99, 191 N.W. 425, 426–27 wherein it was held that the contractual relationships between a promoter and individual purchasers of tracts of land constituted investment contracts notwithstanding the facts that each purchaser was given several options with respect to the tracts of land he purchased which could be exercised independently of the options available to any other purchaser and that there was no pooling of property or funds. Of similar effect is at least one other case cited by the *Howey* Court in support of its definition of investment contract. In Prohaska v. Hemmer-Miller Dev. Co., 256 Ill.App. 331, 338, the court concluded that a contract whereby Illinois residents purchased farm lands in South Dakota for a fractional down payment with the remainder of the purchase price to come from the proceeds of crops grown on the land by the promoter was an investment contract despite the absence of any commingling of crops from the parcels sold and despite the fact that each parcel of land was a separate, distinct property. *See also* People v. White (1932), 124 Cal.App. 548, 555, 12 P.2d 1078, 1081 (*semble*). The absence of a pooling arrangement may also be noticed in at least one of the federal court cases cited in *Howey* as enumerating and applying the definition of investment contract, SEC v. Payne (S.D.N.Y., 1940), 35 F. Supp. 873, 875, 878.

██ Against the background, Justice Murphy's phrase "common enterprise" may well have been nothing more than an attempt to require some sort of "business" interest in an investment contract, nothing more than an attempt to distinguish investment contracts from such passive investment opportunities as time saving accounts in banks. At the very least, it is equally as plausible to conclude that the element of "common enterprise" is satisfied when a single investor commits his funds to a promoter in hope of making a profit as to conclude that the investor protection afforded by the '33 and '34 Acts and the complex regulatory scheme developed thereunder is available only to those hapless capitalists who are not alone in their misfortune. Because the former conclusion is far more consonant than the latter with the principle that the '33 and '34 Acts are remedial legislative acts which should be construed broadly to effectuate their purpose and with what can only be described as the continually expanding reach of federal regulation of securities transactions, this Court is inclined to read the *Howey* definition of investment contract more broadly than was done in *Milnarik, Wasnowic,* and *Stuckey.*

In adopting this position, the Court finds support not only in the cases cited by plaintiff Marshall and the cases relied on by Justice Murphy, but also in the position taken by one of the leading authorities in the field of securities regulation, Professor Louis Loss. In discussing what he terms "investment contracts and the other catchall varieties" of securities, Professor Loss makes the following observation:

> In all these cases proof of some sort of pooling arrangement among investors . . . helps, but it is not essential. 1 L. Loss, Securities Regulation 489 (2d ed. 1961) (footnote omitted).

Finally, it should be noted that the Securities and Exchange Commission has, on several occasions, ruled that various arrangements with no pooling features constitute investment contracts within the intendment of the '33 and '34 Acts. *See, e. g.,* Fineanswer America

Investments, Inc., CCH Fed.Sec.L.Rep. ¶ 78,111 (1970–71 Decisions) (interests in investment advisory service); SEC Securities Act Release No. 5347 (Jan. 4, 1973), CCH Fed.Sec.L.Rep. ¶ 1049 (condominium purchase/rental agreements); SEC Securities Act Release No. 5018 (Nov. 13, 1969), CCH Fed.Sec.L. Rep. ¶ 77,757 (1969–70 Transfer Binder) (whiskey warehouse receipts). Such administrative interpretations by the agency charged with the responsibility of administering the securities laws are entitled to great deference and further convince the Court that the *Milnarik-Wasnowic-Stuckey* reading of the *Howey* formulation is too narrow. Therefore, the Court concludes that the contractual arrangement between Marshall and the defendants is an investment contract and, thus, a security, within the meaning of the '33 and '34 Acts. Accordingly,

It is hereby ordered that the motion to dismiss filed by the defendant Lamson Bros. & Co. be denied.