539 P.2d 1343 (1975)
John R. SAUER and Master Industries, Inc., a Colorado Corporation, Plaintiffs-Appellants,
v.
Stanley R. HAYS, Securities Commissioner of State of Colorado, et al., Defendants-Appellees.
No. 73-315.
Colorado Court of Appeals, Div. III.
June 24, 1975.
Rehearing Denied July 29, 1975.
*1344 Morrato, Gueck & Colantuno, P.C., Jay L. Gueck, Denver, for plaintiffs-appellants.
John P. Moore, Atty. Gen., Irvin M. Kent, Asst. Atty. Gen., Andrew A. Markus, Asst. Atty. Gen., Denver, for defendants-appellees.
Selected for Official Publication.
BERMAN, Judge.
Master Industries and its president, John R. Sauer, commenced this action in the Denver District Court against defendants, the State of Colorado Division of Securities and its commissioner, Stanley R. Hays (Commissioner), seeking a declaratory judgment that the plaintiffs' activities did not violate the Colorado Securities Act, § 11-51-101 et seq., C.R.S.1973 (C.R.S.1963, 125-1-1 et seq.), and further to enjoin the Commissioner from making detrimental statements to the public regarding their activities. The Commissioner filed a cross-complaint and motion seeking a preliminary and a permanent injunction prohibiting Master Industries from selling or offering to sell its distributorships in the State of Colorado until such time as the company complied with the registration and other provisions of the Colorado Securities Act.
After an extensive evidentiary hearing, a judgment was entered permanently enjoining Master Industries, Inc., and its officers and agents from selling or offering to sell Master Industries' distributorships in Colorado until such time as the company may *1345 have complied with the registration and other provisions of the Colorado Securities Act or until further order of the court. This appeal followed.
The sole issue for determination is whether the trial court erred, as a matter of law, in holding that Master Industries' sale of its distributorships constituted the sale of a security as that term is defined in § 11-51-102(12), C.R.S.1973 (C.R.S.1963, 125-1-12(12)). We affirm the judgment.
In holding that Master Industries was engaged in the sale of a security, the trial court made numerous findings of fact based on voluminous testimony and numerous exhibits. We will not present a detailed recapitulation of these findings since we are not at liberty to disturb the trial court's findings, inferences, and factual conclusions when, as here, they are supported by the evidence. Broncucia v. McGee, 173 Colo. 22, 475 P.2d 336; Aetna Casualty & Surety Co. v. Kornbluth, 28 Colo.App. 194, 471 P.2d 609.
Master Industries, Inc., is engaged in the production and sale of motivational courses consisting of printed material, tape recordings, and, in some instances, visual aids. The courses are marketed to the public through the sale of distributorships. In order to attract potential distributors, various ads are placed in local and national newspapers and magazines requesting interested persons to return a prepared questionnaire for "further facts" to the company's home office in Englewood, Colorado. After the questionnaire is received at the home office, contact is made with the inquirer by a salesman of the home office staff whose primary task is to secure the inquirer's attendance at a seminar in Denver, at the inquirer's own expense, in order to learn of opportunities to go into business for himself. To induce persons to attend the seminar, the salesman from the home office is provided with a company manual detailing proper techniques and, in some instances, providing model conversations.
When the inquirer, now a guest, arrives in Denver, he is met at the airport by the salesman whose task then becomes that of making a "good impression." The salesman is admonished, by the company manual, to "look sharp," to "program [his] mind with the fantastic opportunity and the exciting events" about to take place for the guest, and immediately to take and "maintain control" of the guest by emphasizing to the guest that he was "born to be great." The salesman is given tips on shaking hands, taking luggage, and seating the guest in the car or limousine for transportation via "the most scenic route" to the seminar.
Upon arrival at the seminar, the guest is registered and given a name tag and ushered to the main auditorium. The salesman is admonished to "smile," "be outgoing," and to "ask closing questions all day long!" The seminar itself consists initially of the guest completing an application answering specific questions about financial status and monies available for investment. The guest then views slides showing examples of the prestige and wealth which may become his, and he is subjected to a barrage of prepared testimonials from salesmen and distributors stressing the great personal and financial rewards obtained from their experiences with the company. The president, John Sauer, also makes a presentation on income projection, using the multiple ten as a base.
Upon completing the seminar, the guest is escorted to the salesman's office for closing the sale of a distributorship. By the purchase of a distributorship, the guest becomes a "market distributor," that is, he obtains the right to sell at retail to the public only. Alternatively, the guest may be recruited directly to the home office staff as a "market development director." The primary duty of a "market development director" is the recruiting of persons for distributorships and for the home office staff. When the sale of a distributorship is made, the guest signs a "wholesale merchandise distribution agreement" and *1346 pays $2,500 for the marketing right, i. e., the right to buy any one of four product lines at wholesale from the company and to sell at retail to the public. In addition, the guest completes a purchase order form for the inventory of the products for which he has purchased the marketing right, at a cost of an additional $2,500. For $2,500 more, the "Manpower Training Academy" program can be purchased. This program is designed to teach distributors how to effectively market the material purchased. After payment of the necessary money, which often involves financing arranged with the help of the company, the guest, now a "market distributor," is entitled to sell the materials purchased directly to the public at retail at 50% above the wholesale price paid by the distributor.
After closing the sale, the salesman receives a commission of 7% of the amount collected from the now-enrolled distributor, or if assistance was required in closing the sale, the commission becomes "back-to-back," that is, an equal division of the commission to the salesman and the person assisting him.
Those persons who join the home office staff, either from the distributor ranks or as a new recruit, become part of the "Expansion Department." At the lowest level are the "Expansion Directors" or "Market Development Directors" who receive a commission of 14% on the price of the distributorships sold. At the next level are "Group Vice Presidents," who manage one to seven expansion directors and receive a 17% commission on distributorships sold and, in addition, a 3% "override" on their team's production on a monthly basis; at the next level are the "Vice Presidents of Expansion," who receive a 20% commission and an additional 3% override. Advancement from one level to the next is based on quota sales in dollar amounts. Demotions are based on nonproduction of sales of distributorships.
The executive hierarchy consists of the president, John Sauer, the senior vice president, who is also vice president of the "Marketing Department," and the executive vice president. These three executives as employees of the company receive commissions of 19% of all marketing rights plus 19% of the initial inventory acquired by a new distributor. They are entitled to a monthly "draw" of $2,500 against commissions and overrides, not to exceed $5,000 at any one time. The management and control of the company is the sole responsibility of the president.
The Colorado Securities Act provides in relevant part as follows:
"It is unlawful for any person to offer or sell any security in this state unless it is registered under this article or unless the security or transaction is exempted under section 11-51-114." Section 11-51-106, C.R.S.1973.
"`Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate of subscription; transferable share; investment contract . . . or, in general, any interest or instrument commonly known as a `security' . . . ." Section 11-51-102(12), C.R.S.1973.
The trial court did not specifically find that Master Industries' activities constituted any of these forms of security; it found only that "the sale of Master Industries, Inc., of its distributorships constitutes the sale of a security as that term is defined in [§ 11-51-102(12), C.R.S.1973] C. R.S.1963, 125-1-12(12)." Our analysis below leads us to the conclusion that plaintiffs' sales scheme constituted an "investment contract."
The Colorado Securities Act parallels the federal Securities Act of 1933 and the Securities and Exchange Act of 1934, as do the acts of most states. While there is no precedent in our jurisdiction construing Colorado's Act, there are numerous state and federal decisions which have interpreted the term "security" as defined in the *1347 federal acts. We are guided, therefore, in our determination here by the letter and spirit of these cases.
In S. E. C. v. W. J. Howey Co., 328 U. S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, the Supreme Court defined the term investment contract as follows:
"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ."
. . . . . .
"The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."
Although Howey, supra, sets forth specific principles for defining an "investment contract," it also admonished that the definition of a security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." In addition, we are reminded that securities acts are remedial in purpose and are designed to insure full and fair disclosure relative to the issuance of securities and are to be broadly construed. S. E. C. v. W. J. Howey Co., supra; Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564; S. E. C. v. Glenn W. Turner Enterprises, Inc., 474 F. 2d 476 (9th Cir.).
Master Industries contends that the sales of the distributorships herein involved and the sale of products through the distributors clearly fall outside the scope of the Howey decision. They argue that the distributor does not provide capital to Master Industries, but instead invests in his own business; that the only profits which a distributor shares are those which result from his own efforts in reselling products; that the distributor only realizes a profit when, as a result of his efforts alone, he resells a product; and, in addition, that a distributor manages and controls his own business.
In enunciating a legal standard for determining whether a scheme constitutes an investment contract, the court in S. E. C. v. Koscot Interplanetary, Inc., 497 F.2d 473 (5th Cir.), carefully reviewed Howey, supra, and concluded that a literal application of the "solely from the efforts of others" test would "frustrate the remedial purposes of the [Securities] Act" and stated that "the [Securities] Acts can only be safeguarded by a functional approach to the Howey test." The court accordingly adopted the test enunciated by the Ninth Circuit in S. E. C. v. Glenn W. Turner Enterprises, Inc., supra, where the critical inquiry focused on "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."
In S. E. C. v. Glenn W. Turner Enterprises, Inc., 348 F.Supp. 766 (D.Or.), aff'd, S. E. C. v. Glenn W. Turner Enterprises, Inc., supra, and S. E. C. v. Koscot Interplanetary, Inc., supra, the courts were confronted with schemes similar to that before us and recognized that while certain tangible products were being offered to the investors, "it [was] obvious that defendants [were] involved in much more than the mere sale of a product . . ." and that the investors in those schemes "thought they were paying for something more than the materials. That something was the promise and expectation of a return on their investment." S. E. C. v. Glenn W. Turner Enterprises, Inc., 348 F. Supp. 766 (D.Or.). That is the essence of the relationship between plaintiff and the prospective distributors in the case before us.
Here, Master Industries placed ads soliciting inquiries from those interested in a "lush business opportunity for wealth conscious men." For those who did inquire, the fundamental and primary focus by Master Industries' salesmen, as we previously detailed, was to induce them to *1348 come to Denver for a seminar. After their arrival for the seminar, the emphasis now was not on the products but on profits and opportunities for wealth. They were not informed of the nature of the products sold; this fact was carefully camouflaged amongst the testimonials of increase in wealth, the "sharp" looks, the hearty handshakes, and the backslaps and smiles of those whose primary motive was to overbear and dominate the guests' thinking until their signature was obtained. The "guest" was now the prospect and he was continuously barraged with the full arsenal of high pressure sales tactics, the sole purpose of which was to have him sign on the dotted line.
This accomplished, the "prospect" was now the investor and he soon discovered that he was obligated to part with large sums of money to buy a right to market the product. After purchasing the right, additional large sums were needed to buy the product. Once having purchased the product, investors were strongly urged, for even more money, to purchase a course designed to show them how to market the product. The right, the product, and the know-how, in the end, cost the healthy sum of $7,500.
For those who parted with this sum, or accepted financing arrangements, and later discovered that they were not, for numerous and sundry reasons, realizing the promised profits, the next step was to join the home office staff as a salesman. His job then became that of recruiting, for a commission, other prospects as distributors or for the home office staff. Once a salesman, movement up various levels, with concomitant increases in commissions and "overrides," became possible based on sales quotas. It is interesting to note that some persons who attended the seminars were immediately recruited for the home office staff and never became distributors, although they were required to make an investment.[1]
Stripped of its veneer, the scheme involved persons who, for commissions and overrides, induced others to become participants in the plan for the purpose of recruiting still other participants who, for commissions and overrides, recruited still other participants. We are not blinded by the apparent form of this scheme, that is, the sale of distributorships with their profits ostensibly to come solely from the resale of the product to the general public. While distributorships were indeed sold, the whole operation involved an inextricably intertwined sale of distributorships coupled with the right to sell these distributorships. The whole scheme was designed to encourage, by means of large commissions and overrides, participation at the home office level where the sale of the right to sell could continue ad infinitum.
It is the substance of this scheme upon which we must focus and not its form. Tcherepnin v. Knight, supra. "Substance is exalted over form and emphasis is placed on economic reality." Vincent v. Moench, 473 F.2d 430 (10th Cir.). We think the scheme involved here is no less a security because of the sale of distributorships. What, in essence, is being offered is an opportunity to contribute money and to share in the profits of an enterprise managed and owned by Master Industries. In the words of the Securities Exchange Commission, what we have here "is a sales pitch which stresses the amount of money a participant can make on the recruitment of others to participate in the plan." Applicability of the Securities Laws to Multi-Level Distributorship and Pyramid Sales Plans, Sec. Act Rel. No. 5211 (Nov. 30, 1971); H. Bloomenthal, Securities and Federal Corporate Law § 2.13(2).
By § 6-1-102(9), C.R.S.1973, the legislature declared unlawful "pyramid promotional scheme[s]" such as the one here. Although such schemes as defined in that *1349 statute are not specifically included within our Securities Act, that statutory prohibition is indicative of the attitude of the legislature to schemes of this nature. Moreover, similar plans have been held to be violative of securities acts under the "pyramiding" concept and the "risk capital" and "economic reality" concepts. See Frye v. Taylor, 263 So.2d 835 (Fla.Dist.Ct.App.); Florida Discount Centers, Inc. v. Antinori, 226 So.2d 693 (Fla.Dist.Ct.App.); Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906; State v. Hawaii Market Center, Inc., 52 Hawaii 642, 485 P.2d 105. See also Note, 39 Mo. L.Rev. 283, dealing with pyramid promotions as an investment contract.
We are persuaded by the approach adopted in S. E. C. v. Koscot Interplanetary, Inc., supra, and S. E. C. v. Glenn W. Turner Enterprises, supra, and we believe it is the one which will the best further the interest of the investing public of this state. This approach requires only that the promoters of such plans with which we are here concerned make full, complete, and fair disclosure, through the registration statement, of the perils involved before their prospects invest their money. We hold that the scheme here involved is an "investment contract," a "common enterprise" whereby the "fortunes of the investors" were "inextricably tied" and dependent upon the efforts and success of Master Industries in obtaining and recruiting new prospects for its seminars and in consummating sales. S. E. C. v. Koscot Interplanetary, Inc., supra. Thus, it constituted the sale of securities in violation of Colorado's Securities Act. Section 11-51-102(12), C.R.S.1973 (C.R.S.1963, 125-1-12(12)).
In arriving at our decision we have given extended and careful consideration to the cases cited by plaintiffs, but we find them either inapposite or unpersuasive.
Judgment affirmed.
PIERCE and STERNBERG, JJ., concur.
NOTES
[1] At least one person joined the home office staff without having made an investment. However, he was required to bring in a weekly quota of new recruits.