## No. C-830

**The Raymond Lee Organization, Inc., a New York corporation v. Division of Securities; Stanley R. Hays as the Securities Commissioner of the State of Colorado, and William J. Anderson, as Assistant Commissioner**

(556 P.2d 1209)

Decided November 15, 1976.                    Rehearing denied December 27, 1976.

Holme, Roberts & Owen, Donald K. Bain, Paul A. Jacobs, Omer Griffin, Eaton, Van Winkle and Greenspoon, for petitioner.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, Harry N. MacLean, First Assistant, for respondents.

Norman G. Axe, for amici curiae.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

This is on certiorari to the Colorado Court of Appeals to review the decision under the same title to be found in 36 Colo. App. 417, 543 P.2d 75 (1975). The petitioner (The Raymond Lee Organization, Inc.) solicited inventors to enter into contracts, which were of three types. The Colorado Securities Commissioner determined that each type of contract was an "investment contract" and, as such, was a "security," within the scope of the definition of the Colorado Securities Act, section 11-51-102(12), C.R.S. 1973. He issued a cease and desist order directing the petitioner to refrain from the solicitation of the contracts. Upon review under section 11-51-121, C.R.S. 1973, the district court affirmed the decision of the commissioner. On appeal the court of appeals reversed the district court and the commissioner as to one of the contracts and affirmed with respect to the other two. Only the portion affirmed by the court of appeals is here. We reverse.

The three contracts involved are: "Preliminary Product Research Agreement" (Preliminary Agreement), "Development of Invention Agreement" (Invention Agreement) and the "Product and Marketing Development Agreement" (Marketing Agreement). The court of appeals held that the Preliminary Agreement was not an "investment contract," and reversed as to it. Thus we are here concerned only with the Invention Agreement and the Marketing Agreement.

The petitioner solicits ideas and inventions, offering to assist in the development, research, introduction and marketing of the same. It has three departments: engineering, licensing and marketing. We use in substantial part the description of the three contracts given by the court of appeals.

In the Preliminary Agreement, for a fee of $100, the petitioner examines the inventor's proposal, classifies the proposal as to subject matter, researches the record of prior patents relating to the proposal, secures copies from the U.S. Patent Office of patents of related inventions, and presents to the inventor the results of this investigation and proposed procedures for further action.

Under the Invention Agreement, the inventor pays a fee and assigns a percentage interest in the invention to the petitioner. From the briefs filed here, it would seem that the fees range from $675 to $1175, and that the amounts of interest assigned in the invention are from 10% to 20%. Upon entering into the Invention Agreement, the petitioner is to develop and refine the invention for preparation of suitable illustrations, to prepare formal patent drawings and the description to be included in the patent application, to prepare a sales letter and prospectus embracing the general function of the proposal; to contact prospective manufacturers and seek opportunities to negotiate the sale or licensing of the invention; to publicize the invention in consumer and trade publications; and to actively negotiate with those manufacturers expressing an interest in the proposal.

The Marketing Agreement provides for essentially the same services as the Invention Agreement. It requires the inventor to pay a fee plus a commission on any net proceeds received as a result of petitioner's efforts. The particular form of this agreement referred to our attention by the petitioner requires a fee of $375 and a commission of 20%.

In affirming the commissioner's action as to the Invention Agreement and the Marketing Agreement, the court of appeals considered three issues: (1) whether petitioner was denied due process of law; (2) whether the Commissioner's findings of fact were supported by sufficient evidence; and (3) whether either the Invention Agreement or the Marketing Agreement is a "security" as defined in section 11-51-102(12), C.R.S. 1973. We hold that neither of these two agreements is a "security" and, therefore, do not reach the other two issues decided by the court of appeals.

Distilling the issue here considered, the question is whether either of these agreements constitutes an "investment contract" under the statutory definition of "security." The statute cited above reads in part:

"'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate of subscription; transferable share; investment contract . . . or, in general, any interest or instrument commonly known as a 'security' or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing."

■ As a basis, we follow the path blazed in the opinion announced contemporaneously with this one, written by Mr. Justice Erickson, in *Lowery v. Ford Hill Investment Co.*, 192 Colo. 125, 556 P.2d 1201. There it is stated that the definition of "security" in the federal Securities Act of 1933 (15 U.S.C. § 77 b (1) is parallel to Colorado's definition; that "investment contract" is included as a "security" under both statutes; and that, therefore, federal cases on the subject can be persuasive to us. *See Sauer v. Hays*, 36 Colo. App. 190, 539 P.2d 1343 (1975).

■ The mother-lode definition, from which emanate the flakes of judicial extension, is found in *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), as follows:
"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ."

■ For the commissioner's cease and desist order to have validity, the agreements must have the following elements: (1) an investment by an inventor; (2) the investment is in a common enterprise; and (3) the inventor is led to expect profits from the efforts of petitioner or a third party. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

It is evident that those contracts possess elements (1) and (3). We differ with the rulings of the other tribunals in this case solely by reason of (2), the "common enterprise" element. The court of appeals found this as its most difficult problem. It concluded not to follow *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274 (7th Cir.) *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). This conclusion was reached because it felt that the *Milnarik* interpretation of "common enterprise" had been rejected as too stringent by *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974). We think it appropriate to follow *Milnarik*, and do so.

*Koscot* dealt with a pyramid promotion plan which involved the sale of cosmetics. As the first phase, the promotor solicited persons to become "beauty advisors". The beauty advisors were in reality retail salesmen who purchased cosmetics from the promotor at a discount. In the second phase, the promoter would make a beauty advisor a "supervisor," if the person made a $1,000 investment with the promotor. In the event that the supervisor persuaded other beauty advisors also to become supervisors and make the investment, the first supervisor received returns on his investment. Under the third phase, upon an investment of $5,000, a supervisor became a "distributor." The distributor would receive returns from his investment upon recruiting supervisors or other distributors. Intermingled in the plan was the purchase and sale of cosmetics from the promoter at different discounts.

We have no trouble regarding the plan in *Koscot* as common enterprise in which, as there stated, the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." This factor we do not find in the instant case, nor in *Milnarik*.

In the present matter, no other inventor acquired any interest in, nor received any direct benefit from, a particular inventor's invention. While, as in any business or profession, the petitioner had overhead, the proceeds from sale or license of one invention did not go to the holder of another invention.

In *Milnarik, supra*, the plaintiffs deposited money with defendant upon the understanding that the defendant would use the funds at defendant's discretion to trade commodity futures for the benefit of the plaintiffs. This investment was made under a written agreement between plaintiffs and defendant. The defendant made various trades on margin, resulting in a greater loss than the amount invested and, under the terms of the agreement, made demand on plaintiffs for additional money. The plaintiffs then sought to rescind the agreement on the ground that it was a "security" under the Securities Act of 1933. In affirming the United States District Court the court stated:

"We find the element of commonality absent here. Although the complaint does allege that [defendant] entered into similar discretionary arrangements with other customers, the success or failure of those other contracts had no direct impact on the profitability of plaintiffs' contract. [Defendant's] various customers were represented by a common agent, but they were not joint participants in the same investment enterprise."

■ We hold, therefore, that the Invention Agreement and the Marketing Agreement do not possess the element of "common enterprise" and that the Commissioner is without jurisdiction to enter the cease and desist order.

We are not unmindful — and indeed we are quite cognizant — of the possibilities presented to us of deception and other undesirable practices that may be practiced upon inventors. Such possible deception and practices may well be on the subject of statutory prohibitions to be enacted and, conceivably, in some part may now be proscribed by other existing statutes. We simply hold that the Colorado Securities Act (section 11-51-101, *et seq.*, C.R.S. 1973), which is here involved, does not apply in this case.

The matter is returned to the court of appeals for remand to the end that the complaint before the commissioner be dismissed.

MR. CHIEF JUSTICE PRINGLE, MR. JUSTICE ERICKSON and MR. JUSTICE CARRIGAN dissent.

MR. JUSTICE ERICKSON dissenting:

I respectfully dissent. The sole issue here is whether a scheme in which an investor's money and intellectual property are managed, promoted, and marketed by another person, in conjunction with similar services provided to other investors, constitutes a "common enterprise" within the definition of an investment contract enunciated by this court in *Lowery v. Ford Hill Investment Co.*, 192 Colo. 125, 556 P.2d 1201.

It is by now axiomatic that "[i]n searching for the meaning and scope of the word 'security' . . . form should be disregarded for substance and the emphasis should be placed on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Clearly, the "common enterprise" element of the definition of "investment contract" developed in *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), has no single, fixed analytical content. In enacting the Colorado Securities Act in a form virtually identical to the Uniform Securities Act and the Federal Securities Act of 1933, it is clear that our legislature contemplated the same necessary judicial interpretations which have accompanied the implementation of those authorities. "Common enterprise" has been given broad interpretation by some authorities. *See* 3 *H. Bloomenthal, Securities and Federal Corporate Law* § 2.19[10] (1975) (authorities cited).

In the present case, each investor's idea is a more or less distinct invention. When a purchaser buys the patent, the immediate profit is given directly to the investor, with a percentage cut to the Raymond Lee Organization. These factors, viewed alone, would suggest that a common enterprise is not present. However, a realistic view of the particular development scheme offered by the Raymond Lee Organization makes clear that the requisite elements of commonality are present.

In this case, each investor pools his capital to cover not merely the incidentals of office overhead, but the actual development and promotion of his idea. The petitioner uses the funds received from all of the investors to undertake the various promotional and distribution activities which are advertised as the key to successful marketing of the individual ideas. No separate accounting of each investor's input of capital is made. This common promotion, in the form of massive mailings of all the various ideas to corporations, plus general literature and recommendation letters extolling the value of the enterprise run by the Raymond Lee Organization gives to each investor a value which an agent dealing separately with each idea could not achieve. The numerous ideas are, thus, marketed by a common promotion and distribution device financed by a pooling of capital among the several investors. Thus, as to the very purpose of the enterprise, the several investments are treated as one entity and promoted from one fund. This is clearly distinguishable from the mere "common agent" operating discreet accounts in *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274

118

(7th Cir.) *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). The petitioner's system of aggregating the capital and ideas of the several investors is what makes the particular promotion scheme a "common enterprise."

The principal authority upon which the majority relies, *Milnarik v. M-S Commodities, Inc., supra*, is inapposite to this case. The funds deposited by the several investors in *Milnarik* were not the basis for a common scheme of promotion — the broker was a common agent, but no more. The pooling of resources was not a critical factor in the profit-making operations of the commodities investment scheme. Moreover, the *Milnarik* court itself quoted with approval the following "well-reasoned observations" of the trial court in describing the arrangement:

"This characteristic of common enterprise is completely lacking in the present case. Even assuming that Nelson in fact solicited and collected money from numerous parties, no allegations are made that a common enterprise existed comprised of all people possessing discretionary account contracts with him. No claim is made that *Nelson* traded *in a uniform manner for each of these accounts*. Even if he had so uniformly traded, *no pooling of funds for a common purpose* is alleged. Nelson was apparently simply an agent for a number of separate and distinct principals, the plaintiffs being one such principal. The plaintiffs in no way can be viewed as having invested in a common enterprise with other suppliers of venture capital. Without such common investment, the property sale cases are not analogous." (Emphasis added.)

This excerpt makes clear that the facts of *trading in a uniform manner for each account* and *pooling of funds for a* common purpose were absent in that case. In explicitly noting the lack of any "commingling of funds," the *Milnarik* court considered the absence of these features significant in reaching its decision. The presence of these factors is undisputed in this case.[1]

Finally, the mere fact that, *once* the common promotion scheme produces a sale, the return which an individual investor receives is independent of that of other investors is not dispositive. In *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974), the court stated:

"[T]he fact that an investor's return is independent of that of other investors in the scheme is not decisive. Rather, the requisite commonality is evidenced by the fact that fortunes of all investors are inextricably tied to the efficacy of the Koscot meetings and guidelines on recruiting prospects and

---

[1] It should also be noted that the *Milnarik* decision has not fared well as precedent. It has repeatedly been distinguished or criticized. *See, e.g., S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974); *S.E.C. v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974); *Marshall v. Lamson Bros. & Co.*, 368 F. Supp. 486 (S.D. Iowa 1974); *Rochkind v. Reynolds Securities, Inc.*, 388 F.Supp. 254 (D. Md. 1975).

consummating a sale."
*Accord, Saur v. Hayes*, 36 Colo. App. 190, 539 P.2d 1343 (1975) (approving *Koscot* analysis); *Marshall v. Lamson Bros. & Co.*, 368 F.Supp. 486 (S.D. Iowa 1974); *Huberman v. Denny's Restaurants, Inc.*, 337 F.Supp. 1249 (N.D. Cal. 1972); *Berman v. Orimex Trading, Inc.*, 291 F.Supp. 701 (S.D.N.Y. 1968); *Maheu v. Reynolds & Co.*, 282 F.Supp. 423 (S.D.N.Y. 1967); *see also S.E.C. v. Continental Commodities Corporation*, 497 F.2d 516 (5th Cir. 1974); *In re Bestline Products Securities*, 412 F.Supp. 732 (S.D. Fla. 1976); 1 *L. Loss, Securities Regulation*, 489 (2d ed. 1961).

The majority opinion's interpretation of the common enterprise aspect of the *Howey* test is too strict. It ignores the Supreme Court's admonition that the verbal formula "embodies a flexible rather than static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *Accord, State v. Investor's Security Corp.*, 297 Minn. 1, 209 N.W.2d 405 (1973). ("'Common enterprise' can be no more than an aid to reasoning rather than a strict mechanical test.").

The core concept behind the phrase "common enterprise" is attention to those aspects of commonality which imply the joinder of multiple investors in a profit-oriented scheme under the management of another. Where the fortunes of the investors as a class rise or fall upon the common managerial efforts of another, the degree of fairness and disclosure exercised by one who solicits such investments is often in need of scrutiny. It is the joint reliance upon the expertise of another and the pooling of an investment fund placed at his disposal that are the hallmarks of a "common enterprise" under established securities law. To engage in technical distinctions designed to draw a line in form where none exists in substance is to defeat the spirit and purpose of the securities statute.[2]

Finally, the majority opinion ignores an interpretation given to a parallel provision in the Federal Securities Act of 1933. *See* S.E.C. No-Action Letter, *Idea Research and Development, Inc.*, CCH Fed. Sec. L.

---

[2] In advocating a more realistic interpretation of the "common-enterprise" element, I do not suggest that we abandon the case-by-case analysis which is basic to this area of the law. In many transactions, such as those involving ticket brokers or airline flight charter agents, several people in effect "pool" their funds so as to allow the individual acquisition of greater value by virtue of greater purchasing power as a group. This form of joint effort is generally not considered to involve a security because the input of money is for a commercial rather than an investment purpose. The delivery of funds to a manager is not based upon the potential success of an enterprise laden with risks, but rather upon the non-speculative value of aggregate buying power. In these contracts, the investors do not *irretrievably* "pool" their funds so as to allow the enterprise to go forward, because their investment is generally protected by a provision for return of their money if the deal should fail to go through. *Cf.. C.N.S. Enterprises, Inc. v. G & G Enterprises, Inc.*, 508 F.2d 1354 (7th Cir. 1975).

Rep. ¶ 79,759 (April 8, 1974) (in light of emphasis placed upon return on client's investment in advertising, development services contract for ideas and inventions was security).

MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE CARRIGAN join me in this dissent.