**CLAYTON BROKERAGE CO. OF ST. LOUIS, INC., Plaintiff,**

**v.**

**Niles STANSFIELD, Defendant.**

**Civ. A. No. 83–K–1805.**

United States District Court, D. Colorado.

March 30, 1984.

---

**5.** *See* note 3, *supra.*    **6.** *See* note 1, *supra.*

Edwin S. Kahn, Kelly, Haglund, Garnsey & Kahn, Denver, Colo., for plaintiff.

Jon S. Nicholls, Erickson, Holmes, Nicholls, Kusic & Sussman, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This case is before me on plaintiff's motion to dismiss defendant's affirmative defenses and counterclaims. Defendant moved to dismiss pursuant to Rule 12(b)(6), and the parties have each filed affidavits, so I must treat this as a rule 56 motion for summary judgment. Fed.R.Civ.P. Rule 12. I can grant the motion only if there is no genuine issue of material fact. Fed.R. Civ.P. Rule 56(c); *Webbe v. McGhie Land Title Co.*, 549 F.2d 1358 (10th Cir.1977); *McCormick v. United States*, 539 F.Supp. 1179 (D.Colo.1982).

Niles Stansfield is a corn and wheat farmer from Yuma, Colorado. To protect himself from price changes in the market for his crops, Stansfield "hedges" on the futures market of the Chicago Board of Trade. In December, 1981, Stansfield opened an account with Clayton Brokerage Co. Stansfield's broker there was Larry Hicks. As of September 20, 1983, Stansfield spread 300,000 bushels of corn, 150,-000 long, and 150,000 short, through futures with Clayton. Anticipating price increases in corn, Stansfield bought an additional 150,000 bushels long on September 21st. The market opened lower on the 22nd, and Stansfield called Hicks to order more corn. The parties had several conversations that day, but they do not agree on

what they said. They agree that Hicks was concerned about the drop in the market, and needed $30,000 to cover the margin on Stansfield's account. Stansfield told Hicks that he did not have enough cash to cover the margin. They agreed to sell the corn purchased on the 21st to satisfy the account.

Hicks claims, however, that the sale of the 150,000 bushels was not enough to satisfy the margin, and that he tried many times to reach Stansfield to arrange to wire more money to cover the margin. Unable to reach Stansfield, Hicks became insecure and liquidated Stansfield's account in accordance with the brokerage's customer agreement.[1] Stansfield called Clayton shortly before the market closed on the 22nd, and learned of the sale of his entire account at a loss. That evening, Hicks and Clayton's attorney flew to Yuma to explain the brokerage's position to Stansfield.[2] The plaintiff alleges that Stansfield carried a net debit balance of $20,171.60 after it liquidated his account. That evening, Hicks and the attorney asked Stansfield to sign a note for that amount. Stansfield

refused, and they filed suit in this court the next day.

Stansfield claims that Hicks never warned him that he would sell the futures if Stansfield did not send the cash. Stansfield believed the sale of the 150,000 bushels he bought on the 21st would cover his margin. He claims that the brokerage breached both its contract and its fiduciary duty to him by liquidating his account on the 22nd and by demanding his signature on the promissory note that evening. Stansfield further claims that the brokerage agreement was a security within the Securities Exchange Act of 1933 and the Colorado Securities Act, and that the brokerage committed fraud in failing to disclose its power to liquidate the account whenever it felt insecure.

## I. THE FEDERAL AND STATE SECURITIES LAW CLAIMS

[1, 2] Stansfield's counterclaim alleges that his account with Clayton was a security within the meaning of the Securities Act of 1933[3] and the Colorado Securities Act of

---

1. The agreement provides, in part, that:
   You [brokerage] shall have the right, (i) whenever in your discretion you consider it necessary for your protection, because of margin requirements or otherwise ... (b) to sell any or all commodities long in my account(s), (c) to buy any or all commodities short in my account(s), ... all without demand for, margin or additional margin, notice ... of sale or purchase.

2. According to Stansfield, "Mr. Hicks and his attorney ...
   arrived at our home at approximately 9:30 P.M. My wife and I were in our bed clothes and were preparing to retire for the day. Mr. Hicks, Mr. Kahn and I sat at the dining room table and reviewed the events of the day. When Mr. Hicks wanted me to agree on the figures he was presenting to me on a hand written sheet, which to my disbelief and disgust included a charge of $7,677.00 commission fees payable to himself for the actions he had taken earlier that morning without my authorization or knowledge, I said I was still quite concerned about the reason for his actions and that I would not agree with his principle assumption that I owed Clayton anything.
   At that point, Mr. Hicks and Mr. Kahn produced a promissory note in the amount of

$20,171.90 which included the $7,673.00 commission dated September 22, 1983, and due in full on September 29, 1983.... I asked for one day to consult with my lawyer and when Mr. Kahn refused to accept this request, I refused to carry on the conversation any further and asked Mr. Hicks and Mr. Kahn to leave. Mr. Hicks and Mr. Kahn gathered up their papers from the dining room table and left.
Stansfield affidavit at 1–2.

3. When used in this subchapter, unless the context otherwise requires—
   (1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.
   15 U.S.C. § 77b.

1981.[4] The definitions of a "security" in the federal and Colorado acts are virtually identical, and Colorado courts apply federal case law to interpret the Colorado statute. *Lowery v. Ford Hill Investment Co.,* 192 Colo. 125, 556 P.2d 1201, 1205 (1976); *Raymond Lee Organization v. Division of Securities,* 192 Colo. 112, 556 P.2d 1209, 1211 (1976). Generally, federal courts are hesitant to find that commodities accounts are securities within the Securities Act. *E.g. Moody v. Bache & Co.,* 570 F.2d 523 (5th Cir.1978); *Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274 (7th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972); *Westlake v. Abrams,* 565 F.Supp. 1330 (D.C.Ga.1983); *Mullis v. Merrill Lynch, Pierce, Fenner and Smith,* 492 F.Supp. 1345 (D.Nev.1980). Some circuits, including the Tenth, will find that a commodity account is an "investment contract," and thus a security, if the investor doesn't have control over the account. *Securities and Exchange Commission v. American Commodity Exchange,* 546 F.2d 1361 (10th Cir.1976). When applying the investment contract theory to commodity accounts, courts use the three prong test from *Securities and Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). *E.g. Walsh v. International Precious Metals Corp.,* 510 F.Supp. 867 (D.Utah 1981). Under the test, an investment contract is (1) an investment of money (2) in a common enterprise (3) with profits to come solely from the efforts of others.

■ Invariably, commodity accounts involve an investment of money. This case is not an exception. Courts look to whether different investors' resources are pooled in applying the common enterprise prong of the *Howey* test. Stansfield's funds were not intermingled with those of any other investor; he had an independent account with Clayton. Some courts will find a security where there is only one investor, but a promotor has an interest in the investment. "A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Securities and Exchange Commission v. Glenn W. Turner Enterprises,* 474 F.2d 476, 482 n. 7 (9th Cir.) *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), quoted in *Securities and Exchange Commission v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir.1974), and *Walsh v. International Precious Metals Corp.,* 510 F.Supp. 867, 871 (D.Utah 1981) ("It makes no sense to penalize the single investor simply because he happens to be alone in his misfortune.") Clayton profited only from its commissions on the account. The fortunes of the brokerage and its client were in no way interwoven. There was no pooling of resources in this case.

The third prong of the *Howey* test, profits to come solely from the efforts of others, looks to the degree of control the investor has over the management of his account. Stansfield contends that Clayton's unauthorized sale of his futures demonstrates that he had little or no control over his account, and that the account is a security. To find a security in this case, I need not find that Stansfield profited "solely" from the efforts of the brokerage. Following *United Housing, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Tenth Circuit recognizes that the word "solely" from the *Howey* test should not be strictly applied when the

---

**4.** 'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate of subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a 'security' or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing. 'Security' does not include any insurance or endowment policy of annuity contract under which an insurance company promises to pay a sum of money either in a lump sum or periodically for life or some other specified period.

Colo.Rev.Stat. 11–51–102 (1973 & Supp.1983)

economic realities of a transaction dictate that the remedial purposes of the Act would be served by finding a security. *Crowley v. Montgomery Ward & Co.*, 570 F.2d 875 (10th Cir.1975). In *Crowley*, the Tenth Circuit adopted the test set forth in *Securities and Exchange Commission v. Glenn W. Turner Enterprises*, 474 F.2d 476 (9th Cir.) *cert. denied* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). According to *Crowley* a security exists when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." 570 F.2d at 877, quoting *Turner*, 474 F.2d at 482.

Stansfield's affidavit reveals that he did not rely on the expertise of his broker. As he himself admits, Stansfield was solely responsible for formulating his investment strategy:

> If I am not sure that the market is at its high, I may use what is known as a 'spread' until the market gives a technical and fundamental sign that it has reached the top.... In 1983 I intended to use precisely the same strategy (as in 1980).... On the evening of September 20th, the U.S.D.A. announced the disappearance of a large supply of soy beans from the market pipeline, and in my view this information would cause the market in corn to rise, as it did.

Second Stansfield Affidavit at 1–2. In view of Stansfield's active role in his commodities account and the lack of any common enterprise, I hold that Stansfield's account was not a security under either the Securities Act of 1933 or the Colorado Securities Act of 1981.

## II. THE FRAUD COUNTERCLAIM

[4, 5] Stansfield alleges that Clayton's failure to disclose its power to close his positions constituted fraud or deceit. Under Colorado law, a party who signs a contract without reading it is barred from claiming that he is not bound by what he signed. If, however, one party claims that the other party misrepresented the contents of the contract, the cases look at what a reasonably prudent man would do for his own protection. *Rasmussen v. Freehling*, 159 Colo. 414, 412 P.2d 217 (1966). To support a cause of action for fraudulent concealment, plaintiff must show (1) concealment of a material fact which in equity and good conscience should be disclosed; (2) knowledge that one is concealing the fact; (3) ignorance on the part of one from whom the fact is being concealed of the existence of the concealed fact; (4) intent that the concealment be acted upon; and (5) damage. *Teodonno v. Bachman*, 158 Colo. 1, 404 P.2d 284 (1965).

▪ The agreement Stansfield signed is less than two pages long, and simply lists a series of conditions for the transactions between the parties. Stansfield does not allege that Clayton actively misrepresented the contents of the agreement, nor that the brokerage intended to defraud him. Given Stansfield's sophistication and the relative ease of reading a two page document, I uphold Stansfield's duty to read the contract before signing it and dismiss the claims of fraud. To hold otherwise would require any party drafting a contract to read the entire contract to whoever signs it.

## III. BREACH OF CONTRACT OR FIDUCIARY DUTY

▪ The final issue before me is whether Clayton breached the contract or its fiduciary duty to Stansfield either when he liquidated Stansfield's account or when it demanded that Stansfield sign the note. Under Colorado law, the test is whether Clayton acted in good faith:

> A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

Colo.Rev.Stat. § 4–1–208 (1973). Stansfield has introduced evidence that the bro-

**842**

kerage did not act reasonably in liquidating his account. The parties disagree on fundamental issues such as the content of their phone conversations,[5] Stansfield's reputation in the business community,[6] whether the brokerage's attorney advised Stansfield, as counsel, to sign the promissory note,[7] and the extent of the damages, if any, caused by the liquidation.[8]

Plaintiff cites only one case in support of dismissing the breach of contract counterclaim, *Sparkman v. Peoples National Bank of Tyler*, 580 S.W.2d 868 (Tex.Civ. App.1979). The case is distinguishable. In *Sparkman*, the plaintiff, a contractor, borrowed money from a bank to buy building materials. When the bank accelerated his payments, the contractor sued for conversion and slander. The bank established by "clear, direct, and convincing evidence," 580 S.W.2d at 869, that several of the contractor's payments were past due and that plaintiff made false representations as to the maintainer used as collateral.

In this case, the only grounds for insecurity that the brokerage advances is Stansfield's failure to return phone calls on the morning of September 22nd. There are still genuine issues of material fact with regard to the brokerage's good faith and the amount of damages. I cannot dismiss the breach of contract counterclaims.

Accordingly, the motion to dismiss is granted as to the security and fraud counterclaims and denied as to the remaining counterclaims and affirmative defenses.

5.  "At no time during our conversation or during any later conversations that morning did [Hicks] state that if any money of any amount, $30,000 or otherwise, was not received or wired to him would he liquidate all my accounts or liquidate any of my positions at all." Stansfield affidavit at 2.

"I told him that the initial margin would not go away even if he liquidated (his order of the 21st) by the close (of the day's trading) and that he must bank wire as much as he could." Affidavit of Larry Hicks at 3.

6.  "[The brokerage] knew, or should have known, that defendant is an established rancher of *substantial means and solid reputation*." Response to Motion to Dismiss at 2.

Plaintiff shall file its reply to the counterclaim within ten days of the date of this order.

"I also checked on Mr. Stansfield's reputation with two Yuma residents, and my concern increased." Affidavit of Larry Hicks at 3.

7.  "I stated again that I desired to consult with legal counsel and Mr. Hicks and [the attorney] assured me that [the attorney] was an attorney, and when I asked him what he would advise me to do he said he would advise me to sign the promissory note." Stansfield affidavit at 3.

8.  The counterclaim is for $150,000 in actual damages. At various places in his affidavits, Stansfield claims losses of $33,000 and $10,000. The brokerage claims that the market for corn futures declined steadily after it liquidated the account, and it thus saved Stansfield from further losses.